BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF CINCINNATI, et al., Plaintiffs,

v.

The DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, et al., Defendants.

Civ. No. C-1-74-185.

United States District Court, S.D. Ohio, W.D.

July 2, 1986.

Order July 8, 1986.

Consent Decree Feb. 17, 1987.

John A. Lloyd, Jr., Cincinnati, Ohio, for plaintiffs.

Sandra L. Beber, U.S. Dept. of Justice, Educational Opportunities, Litigation Section, Washington, D.C., Donetta D. Wiethe, Asst. U.S. Atty., Cincinnati, Ohio, for defendants.

## OPINION

DAVID S. PORTER, Senior District Judge.

## I. PROCEDURAL POSTURE

This case is now before this Court for final disposition pursuant to instructions of the United States Court of Appeals for the Sixth Circuit. In May 1974 the Board of Education of the Cincinnati City School District [hereinafter Board] filed this suit, challenging the Department of Health, Education and Welfare's [HEW] decision that they were ineligible for funding under the Emergency School Aid Act [ESAA], 20 U.S.C. §§ 1601–19 (Supp.1974).[1] The Board sought declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

In April 1975, acting in the belief that the matter was submitted on the merits for judicial review on cross-motions for summary judgment (docs. 7, 11), this Court decided on the record then before it that the Board's motion should be denied while HEW's should be granted (docs. 20, 21). We determined that HEW's ineligibility determination was not arbitrary, capricious,

1. The Act was repealed and simultaneously re-enacted, with amendments not material here, by Title VI of the Education Amendments of 1978, Pub.L. 95–561, 92 Stat. 2252, 2268, effective September 30, 1978. The reenactment was recodified as 20 U.S.C. §§ 3191–3207 (1976 ed., Supp. II). The reenactment was in turn repealed in 1981 by Title V of the Education Consolidation and Improvement Act of 1981, Pub.L. 97–35, 95 Stat. 480, effective October 1, 1982. The statutory references herein will be to the 1972 Act and to the old Code sections (§§ 1601–19) because they govern this case.

or otherwise inconsistent with the Administrative Procedure Act, (5 U.S.C. § 706(2)(A)–(D)), the ESAA, or the regulations promulgated thereunder, 45 C.F.R. §§ 185.01 *et seq. Board of Education of the City School District of the City of Cincinnati v. Department of Health, Education and Welfare, Region 5,* 396 F.Supp. 203 (S.D.Ohio 1975).

On appeal the Sixth Circuit Court of Appeals affirmed our denial of the Board's motion, but reversed our grant of summary judgment to HEW. The Sixth Circuit reminded us that courts "should be slow in disposing of a case of any complexity on motion for summary judgment." *Board of Education of the City School District of the City of Cincinnati v. Department of Health, Education and Welfare, Region 5,* 532 F.2d 1070, 1071 (6th Cir.1976). The Court found that summary judgment was improper in this instance because all four of the grounds advanced by HEW for denial of the funds involved genuine issues of material fact. *Id.* The Sixth Circuit therefore ordered "the case remanded for appropriate evidentiary hearing and findings of fact." *Id.*

Moreover, the Court of Appeals stated that the factual issues in the school desegregation case *Bronson v. Board of Education,* No. C–1–74–205 (S.D.Ohio), involved many of the same issues of fact, which "should be determined either before or contemporaneously with the determination of the issues of fact in the present case." *Id.* We were directed "not to enter a final judgment in this present case until a final judgment has been entered in *Bronson.*" *Id.* The Sixth Circuit also ordered that the $1,200,000 escrow account established by this Court's order be maintained until the final disposition of the litigation at both the trial and appellate court levels. *Id.*

Following the remand of this case, the Board supplemented its complaint, alleging that HEW improperly denied the school district funds again in the 1976 ESAA program for the same reasons it had improperly denied the 1974 grant application (doc. 41). This Court entered a preliminary injunction directing HEW to hold in escrow the funds requested in the 1976 application (doc. 43). After we denied HEW's motion to dissolve the preliminary injunction relating to the 1976 application (doc. 50), the parties agreed to reduce the amount to be held in escrow for the 1976 application to $1,696,762 (doc. 60). The Sixth Circuit affirmed our denial of HEW's motion for reconsideration and dissolution of the preliminary injunction, agreeing that it was proper for the supplemental proceeding on the 1976 application to be stayed pending the resolution of the *Bronson* litigation (doc. 62).

On June 22, 1984 a consent decree was entered in the *Bronson* case, thus resolving it without trial on the merits. The settlement of that case, albeit without adjudication of the issues of fact, meant that we could proceed to final judgment in this case. Therefore this case was reactivated in September 1984.

Our first goal was to comply with the Sixth Circuit's instruction that we conduct an "appropriate evidentiary hearing and findings of fact." 532 F.2d at 1071. Unfortunately the *Bronson* litigation offered us little guidance in resolving whatever issues of fact were common to both cases, so we sought to determine the proper procedure to follow in carrying out the Sixth Circuit's mandate. At our request, in October 1984 the parties submitted briefs on the question of the proper scope of our review in this case (docs. 67, 69, 70). With regard to the issue of the appropriate record for review, HEW also pointed out that the complete administrative record had not ever been submitted to this Court. Doc. 69 at 13. They proposed that they would assemble such a record, after which the Board would have an opportunity to file additional material. *Id.*

Rather than ruling immediately on the scope of and proper record for review, we waited until HEW filed what they considered to be the complete administrative record, to which extensive reference will be made herein. In addition to the documents that had been before this Court in 1975, they submitted all non-privileged doc-

uments and data gathered by HEW from the Board, and the analyses and correspondence generated within HEW during its review of the Board's 1974 and 1976 ESAA applications. Altogether, seven boxes of material were submitted.

Once the record had been supplemented, we scheduled a hearing on the adequacy of HEW's fact-finding process. At the request of counsel for the Board, this hearing was postponed to allow them enough time to review the administrative record and determine whether depositions would be necessary to supplement it. On February 6, 1985 a meeting was held with counsel for both parties at which the schedule for the hearing was discussed. *See* doc. 74. At the conference, counsel for the Board indicated that they were not then prepared to specify what, if any, additional discovery they wished to undertake to supplement the record.

In a letter dated February 26, 1985, counsel for the Board informed this Court that they would "argue the inadequacy of the fact-finding process basically from the 'administrative record' as presented to us by the defendants." They also anticipated presenting limited testimony from John Grate, a Cincinnati School District employee who had been principally responsible for preparing and coordinating the ESAA applications. The evidentiary hearing was never held, however, because counsel for the Board ultimately decided they did not want to call any witnesses.

In the absence of any additional evidence or testimony on the adequacy of the fact-finding process, the parties were asked to submit proposed findings of fact and conclusions of law addressing both the scope of judicial review and the merits of the case. After receipt of these submissions (docs. 78, 79, 80, 81), this Court called a status conference to discuss what further proceedings were appropriate in this case.

At the conference, held May 6, 1986, counsel for the Board stated that they wanted to supplement the paper administrative record submitted by HEW. Specifically, the Board wanted the Court to consider an affidavit of John Grate, which had been filed already as an attachment to the Board's memorandum opposing dissolution of the preliminary injunction (doc. 46). In addition the Board requested the inclusion of the depositions of O.O. Barr and Mary Jane Calais which had been taken in the *Bronson* case. After some discussion, counsel for HEW agreed that they would not object to these additions to the record (doc. 84 at 8).

The Board agreed to supply these additional documents to the Court and HEW. HEW also agreed to give the Board copies of the documents that had been withheld from the administrative record, and which this Court ruled were not privileged (doc. 82). The Board was allotted three weeks in which to supplement their brief to this Court in light of these additions to the record, which they did (doc. 85). HEW was given an additional week thereafter for a reply, but they chose not to do so. Following oral argument on June 6, 1986, the parties were asked to address the issue of whether interest could be ordered on the money held in escrow. Plaintiffs filed a memorandum (doc. 88), as did defendants (doc. 90). The case was thus finally submitted for disposition on the merits.

## II. STANDARD OF AND RECORD FOR REVIEW

■ It is undisputed that our review of HEW's decision is governed by the Administrative Procedure Act, 5 U.S.C. § 706. What is disputed is the appropriate subsection for us to apply in this case. The APA provides that a reviewing court shall "decide all relevant questions of law" and "hold unlawful and set aside agency action, findings, and conclusions" if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if they do not meet constitutional, statutory, or procedural requirements. 5 U.S.C. §§ 706(2)(B)–(D). The court "shall review the whole record" in making these determinations. 5 U.S.C. § 706. The vast majority of administrative decisions are reviewed under these provisions. If, however, the matter is "reviewed on the record of an

agency hearing," the reviewing court may set the action aside if it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(E). Alternatively, a reviewing court may set aside an agency action that is "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2)(F).

Plaintiffs contend that the facts in this case are subject to de novo review under section 706(2)(F) because HEW's action was adjudicatory in nature and HEW's fact-finding procedures were inadequate. Doc. 67 at 3–7, citing *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Newsome v. Vanderbilt University*, 653 F.2d 1100 (6th Cir. 1981).

Specifically, the Board contends that HEW did not conduct hearings with appropriate procedural safeguards. Doc. 67 at 5. Nor did HEW maintain a complete contemporaneous record of their fact-finding and decision-making process. *Id.* The Board also argues that HEW did not conduct an independent fact-finding procedure to aid its determination of the unconstitutionality of the Board's nonimplementation of the 1973 busing resolution.[2] *Id.* Finally, the Board contends that *ex parte* communications between HEW and parties other than the Board affected the denial of their application, and that the failure of HEW to disclose these contacts underscored the inadequacy of HEW's fact-finding process. *Id.* at 7–8.

Although HEW agrees that the decision to deny funding was an adjudicative decision, they contend that it is not subject to de novo review under section 706(2)(F). Doc. 69 at 8. HEW asserts that its fact-finding procedures were adequate because they were adopted pursuant to duly promulgated regulations which placed the burden of establishing eligibility on the prospective grantee. *Id.* at 9. The regulations implementing ESAA did not require

hearings regarding eligibility prior to an award of assistance. *See* 45 C.F.R. § 185.-46(c) (1974). Moreover, HEW points out that they compiled a substantial record of the steps leading to their decision, and the reasons therefor, which were communicated to the Board. *Id.* at 8.

We find that the key issue is whether HEW's fact-finding procedures were adequate. There is little to guide us, however, in making that determination. The two key Supreme Court cases on this question, *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, and *Overton Park*, 401 U.S. 402, 91 S.Ct. 814, upon which both parties rely, offer little assistance. In both of these cases, the Supreme Court determined that the fact-finding was not inadequate. Moreover, there are few cases holding that agency fact-finding was so deficient that de novo review was required. But *see, Porter v. Califano*, 592 F.2d 770, 782–783 (5th Cir.1979) (finding substantial bias).

In the Sixth Circuit, however, it is clear that de novo review "is the exception rather than the rule" unless such review is provided by statute. *Upjohn Manufacturing Co. v. Schweiker*, 681 F.2d 480, 483 (6th Cir.1982). In that case the Sixth Circuit rejected the assertion that informal fact-finding procedures were "inadequate in the sense that they are subject to de novo review." *Id.* In this case HEW's informal fact-finding produced a vast quantity of documents and statistics, which suggest that their procedure was comprehensive if not particularly selective. In light of the law in this Circuit, therefore, we find that a de novo hearing within the meaning of 5 U.S.C. § 706(2)(F) is not appropriate here. Rather, we believe the proper standard of review is that of §§ 706(2)(A)–(D). Thus, we must determine if HEW's decisions were "arbitrary, capricious, an abuse of discretion, or otherwise unlawful," § 706(2)(A), or whether they fail to meet procedural, statutory, or constitutional requirements, §§ 706(2)(B)–(D).

■■■ We think that this conclusion is consistent with the Sixth Circuit's instructions

---

**2.** Although we agree with this contention in Part IV of this Opinion, we do not find that this

resulted from HEW's inadequate fact-finding process, but rather from their legal analysis.

when they remanded this case to us. The Court of Appeals' direction "for appropriate evidentiary hearing and findings of fact," 532 F.2d at 1071, did not mean that we should hold a trial and make up a new record in our Court. Such a mandate would be inconsistent with the Supreme Court's holding in *Camp v. Pitts* that a trial de novo was inappropriate for court review of a similar informal, adjudicatory agency decision. *See* 411 U.S. at 142, 93 S.Ct. at 1244. Since we cannot interpret the Court of Appeals' instructions to be contrary to Supreme Court precedent, we believe they did not intend us to hold a de novo trial of the facts upon which HEW based its decision.

We still must ascertain what they did mean by their instruction concerning the "appropriate evidentiary hearing and findings of fact." Most simply it means that we are to decide the disputed issues of material fact which the Sixth Circuit found to exist with regard to each of the four grounds advanced by HEW for denying ESAA funds. See 532 F.2d at 1071. Thus, instead of deciding this complex case on cross motions for summary judgment, we should allow both parties to submit evidence in addition to the administrative record, if necessary, to support their position, and then base our findings of fact thereon.

This does not constitute a de novo review within the meaning of section 706(2)(F). Rather, defendants have pointed out, this is a proper interpretation of the Sixth Circuit's instructions when read in light of *Overton Park*. In that case the Supreme Court instructed the district court that review of the Secretary's decision

> ... is to be based on the full administrative record that was before the Secretary at the time he made his decision. *But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation* in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.

401 U.S. at 420, 91 S.Ct. at 825 (emphasis added). The defendants thus urge us to conclude that the Court of Appeals' instruction meant that we should "hold a hearing to determine what is properly in the administrative record and whether any additional explanation by way of testimony or other evidence is necessary to properly review the Secretary's decision." Doc. 69 at 12. We agree. Thus, the Court of Appeals would have us take evidence and make findings of fact in order to evaluate the Board's claim that HEW's decisions must be set aside.

Moreover, this interpretation of the Court of Appeals' order is proper in light of their further instruction that "[t]he issues of fact involved in *Bronson* should be determined either before or contemporaneously with the determination of the issues of fact in the present case." 532 F.2d at 1071. We believe that this order indicates that the Court of Appeals thought, as do we, that the critical question in both cases was one which we found to be unresolvable on the record that was before us in 1975.[3]

---

3. It is clear that the panel of judges, (Phillips, Weick, and Lively), who remanded this case to us in 1976 was familiar with the issues raised in *Bronson.* In the year prior to their decision in this case, that panel had granted an interlocutory appeal in *Bronson,* 512 F.2d 718 (6th Cir. 1975), and interpreted and modified our interlocutory order therein, 525 F.2d 344 (6th Cir. 1975). The issue confronted by the panel in these *Bronson* decisions was whether the defendant Board was entitled to raise the affirmative defense of *res judicata* as to the factual issues determined in an earlier school desegregation case, *Deal v. Cincinnati Board of Education,* 244 F.Supp. 572 (S.D. Ohio 1965), *aff'd,* 369 F.2d 55 (6th Cir.1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), *aff'd on other issues,* 419 F.2d 1387 (6th Cir.1969), *cert. denied,* 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971). Thus, these judges knew that the central issue in *Bronson* was whether there was any constitutional violation by the Board since *Deal.* Indeed, we believe that by deciding that the within case should not be decided until contemporaneously with or after *Bronson,* the Court of Appeals wisely avoided the possible scenario of a finding by this Court that HEW did not abuse its discretion in finding there was a constitutional violation on the part of the Board, and a judicial determination in *Bronson* that there was no such constitutional violation.

That is, whether the nonimplementation of the previously adopted desegregation plan was a constitutional violation by the Board, rendering them ineligible for ESAA funds. The Sixth Circuit expected that this issue would be resolved in *Bronson*. The *Bronson* case settled, however, without any such findings or admissions of discriminatory acts by the Board.[4] Thus we are left with a critical issue that must be resolved in this case.

As to the proper record for review, we recognize that the Administrative Procedure Act provides that we "shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The Supreme Court has interpreted this to mean that we should review "the full administrative record that was before the Secretary at the time he made his decision," *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825, or "the administrative record already in existence." *Camp*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).[5]

█ The Board has argued that this Court's review should not be confined to the administrative record submitted by HEW. Rather, they contend that they are entitled to supplement that record by presenting additional testimony and evidence to this Court. Doc. 67 at 8–15. The

Board asserts that this is necessary to enable them to prove that the principal, if not the sole reason for HEW's conclusion that the Board was ineligible for ESAA funding was the Board's failure to implement their December 10, 1973 busing resolution. They assert that they would also be able to prove that there has been improper *ex parte* contacts between HEW decision-makers and the Cincinnati Chapter of the NAACP. *Id.* at 14. Moreover, they allege that they could show that the three other grounds proffered by HEW for ineligibility were actually "hypertechnical justifications for the ineligibility decision." *Id.* at 13.

HEW has opposed any supplementation of the record to include material which was not "before" the agency official making the challenged decision. Doc. 69 at 13–15. In particular, they object to any inquiry into the mental processes of the administrative officials who made the ineligibility decision. *Id.* at 13. According to HEW, such inquiry is appropriate only in unusual circumstances, such as when there has been a strong showing of bad faith or improper behavior. *Id.* In this case, HEW asserts, the Board "has only made a bare-bones allegation of impropriety which is contradicted by the sequence of events surrounding the decisions." *Id.* at 15.

It is also noteworthy that O.O. Barr, an HEW Office of Civil Rights official involved in Cincinnati's eligibility determination, believed this to be the decisive issue. See Finding 77.

**4.** The *Bronson* settlement agreement states, *inter alia,* that the parties recognize "that the Board, Superintendent and State Defendants have denied and continue to deny that they or their predecessors have violated the Constitutional rights of any of the students in the Cincinnati Public Schools and deny that any of their acts or omissions, or any acts or omissions of their predecessors have caused racial isolation in the Cincinnati Public Schools to the extent that such isolation exists at present or has ever existed." Settlement Agreement at 2.

**5.** This case is an excellent example of the inadequacy of these instructions for determining the precise content of the record for review of administrative action. As noted in K. Davis, *Administrative Law Treatise* § 29.01–6 (1982 Supp.),

An administrator who takes informal action may draw upon all sorts of scattered information, some of which he or his staff may have specifically in mind and some of which may influence the decision without conscious or specific identification of the information in the minds that contribute to or make the decision. The *assumption* that a "full administrative record" is "before" an administrator when he takes action that is not based on an evidentiary hearing may usually be contrary to the fact.

This description seems to apply in this case where there was in reality a series of decisions by various lower level officials, which in turn affected what "record" would be before the official who ultimately approved the preliminary conclusions of these staff members, and memorialized them in the ineligibility letters. The reality of a situation such as this is well-illustrated in the Findings of Fact below which set forth the entire chronology of events. It is also demonstrated by the fact that it took HEW over three months to assemble the record (comprised of seven boxes) that was theoretically "before" the officials making the challenged decisions.

We disagree. The Board has made specific allegations regarding the reason for HEW's denial of ESAA funding to them, and we believe that they are sufficiently plausible to justify the admission of additional evidence in support of their theory. Moreover, these allegations relate specifically to the non-implementation issue which we must decide due to the absence of any findings in *Bronson* on the constitutionality of the Board's actions.

Finally, the admission of these additions to the record appears proper in light of the Sixth Circuit's instructions to us. In particular, we think that the consideration of documents prepared in connection with the *Bronson* case is proper because the Sixth Circuit told us to postpone our decision until the resolution of that case. The documents in question are depositions of two HEW officials that describe HEW's decision-making process with regard to the Board's application. Consequently they are also appropriate for us to consider because they "disclose the factors that were considered or the Secretary's construction of the evidence." *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825. We therefore consider their inclusion in the record necessary to comport with our understanding of the Court of Appeals' instructions to us as discussed above.

Pursuant to the above legal analysis, this Court gave both parties an opportunity to supplement the administrative record compiled by HEW should they so desire. The Board requested that three additional documents be included in the record, and HEW did not object. *See* document 85 at 8. Thus, we have consensus between the parties on what constitutes the entire administrative record on which we may base our decision.

In summary, this case is now submitted for final disposition on the merits, as distinguished from being submitted on cross-motions for summary judgment. Consequently our present analysis must be far different from that employed in 1975. Instead of being bound by the requirements of Federal Rule of Civil Procedure 56, and determining whether there are disputed material facts, we must now make findings of fact and conclusions of law on the Board's charges that HEW improperly denied them ESAA funding in 1974 and 1976.

We must do this in light of the standard of review established by sections 706(2)(A)–(D) of the Administrative Procedure Act. Thus, we must determine whether HEW's rejections were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), and if the decisions "meet constitutional, statutory, or procedural requirements." 5 U.S.C. § 706(2)(B)–(D). We must determine, for example, whether HEW's funding decisions evidenced bias or other improper motive, and whether the nonimplementation of the December resolution was really the sole reason for HEW's decisions. Moreover, we must also decide all relevant questions of law, including whether HEW was correct that the Board was ineligible for ESAA funds because it had unlawfully discriminated against children by failing to implement the Board's December 1973 desegregation resolution.

Our task is formidable in light of the fact that we must do all of this on the basis of an unwieldy administrative record, and without the benefit of a decision regarding these matters in *Bronson*, in which a resolution was expected by the Court of Appeals that would be dispositive of this case.[6] We now proceed to that task.[7]

---

**6.** If the *Bronson* plaintiffs had prevailed, the finding of the Board's unconstitutional conduct would have meant that HEW was correct in denying them ESAA funds on that basis. If the Board had prevailed in *Bronson*, however, it would not necessarily have meant that HEW was incorrect. This would be true for two reasons. First, HEW's other bases for denying the Board's eligibility might be upheld. Second, the Supreme Court has held that "the discrimination that disqualifies for funding under ESAA is not discrimination in the Fourteenth Amend-

ment sense." *Board of Education, New York City v. Harris*, 444 U.S. 130, 149, 100 S.Ct. 363, 374, 62 L.Ed.2d 275 (1979). The ineligibility provisions of ESAA contain additional requirements, imposing a stricter standard for eligibility for ESAA funds than that of Title VI, so that "the fact that a violation of Title VI makes a school system ineligible for ESAA funding" does not mean "that only a Title VI violation disqualifies." *Id.* at 149–50, 100 S.Ct. at 374.

**7.** Footnote 7 on page 1515.

## III. FINDINGS OF FACT

At the request of the Court, the Board submitted proposed findings of fact and conclusions of law (doc. 78) to which HEW responded (doc. 79) and the Board replied (doc. 80). Both parties were permitted to submit additional briefs in light of our ruling regarding privileged documents and the expansion of the administrative record (docs. 82, 85), but only plaintiffs chose to do so. (Doc. 85.) We have used these submissions as a framework which we have adapted in light of our own independent review and analysis of the complete record, and the relevant law.

### A. BACKGROUND

1. In 1963 a class action suit was filed against the Cincinnati Board of Education alleging, *inter alia*, that the Board was operating de facto racially segregated schools. *Deal v. Cincinnati Board of Education*, 244 F.Supp. 572 (S.D.Ohio 1965), *aff'd*, 369 F.2d 55 (6th Cir.1966), *cert. denied*, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967) [*Deal I*], *aff'd on other issues*, 419 F.2d 1387 (6th Cir.1969), *cert. denied*, 402 U.S. 962, 91 S.Ct. 1630, 29 L.Ed.2d 128 (1971) [*Deal II*]. The *Deal* litigation lasted over eight years, and included two decisions by this Court, two appeals to the Sixth Circuit, and two denials of certiorari by the Supreme Court. In sum, the result of this litigation was a 1966 holding that the Board had no constitutional duty to alleviate the racial imbalance that was found to exist in the Cincinnati public schools because it had not been intentionally caused by the Board. *Deal I*, 369 F.2d at 61, 63–65.

Moreover, both this Court and the Court of Appeals concluded that numerous specific actions and policies of the Board challenged by the *Deal* plaintiffs did not violate their constitutional rights. *Deal II*, 419 F.2d 1387. Specifically, the Court of Appeals affirmed the district court's finding that there was no evidence that the Board assigned teachers or other staff members on the basis of race. *Id.* at 1394. To the contrary, the Court found "that the Board was actively attempting to integrate its staff at all levels...." *Id.* The Sixth Circuit found "no inequality of educational facilities based upon racial classifications," and no evidence of gerrymandering of school boundary lines to exclude blacks from certain schools. *Id.* at 1392, 1394.

2. During the pendency of *Deal*, the Cincinnati Board of Education adopted a resolution entitled "Statement of Position on Race." (Box 6, Folder 2, Board Minutes of February 28, 1966.[8]) The resolution stated in part:

On March 9, 1964 the Board adopted a policy statement on the selection of sites for schools, establishment of attendance area boundary lines and assignment of pupils. This statement of the Board's position expresses the present policy of the Board to avoid predominantly Negro schools to the extent that the Board has any control over the causes which create such predominance; but stated that in exercising its control, the Board would not deviate from the requirement of Ohio law that schools be located where they will be most convenient for the largest number of students. The Board also expressed its willingness to make race of students one of the elements to be considered in the establishment of attendance zone lines along with other factors which have always been considered, such as safety of children, travel distance, capacity of the school and close relationship between parents and teachers.

\* \* \* \* \* \*

The Board and the administration have taken many positive actions to achieve these ends: the employment and assignment of integrated staffs have been increased markedly; interracial experiences for children in predominantly Negro and white attended schools have

---

7. This task was faciliated by the research and drafting assistance given this Court by its law clerk, Martha H. Good, J.D., Ph.D. (Political Science). Her background suited her ideally to work on this difficult case, and her contribution has been outstanding.

8. Citations in this form are to the administrative record submitted and indexed by HEW.

been amplified; district boundaries have been drawn to avoid predominantly Negro-attended schools in those situations where that has been possible; efforts have been intensified to provide multiracial instructional materials; steps have been multiplied to compensate for educational and other deprivations in some communities and deliberate efforts have been made to insure good human relations both within the classroom and in out-of-class activities.

This Board and the administration have examined these past and current efforts and are seeking additional successful approaches. A careful examination of techniques that have been tried in other cities reveals that procedures such as bussing, open enrollment, deliberate balancing, shifting of attendance boundaries, [and] reorganization of grades or educational parks have not contributed a total solution for all situations.

Nevertheless, the leadership of the school system does not wish to close the door on further experimentation and innovation. All reasonable approaches to better interracial experiences will be considered, and those that seem likely to work will be tried on an experimental basis. It is stressed that no single technique will solve this problem in the Cincinnati school district or any other large city.

*Id.* at 59–60.

3. In 1967, a group of business leaders commissioned a study of the Cincinnati Public Schools which was completed in August, 1968. Titled *Report: Cincinnati School Survey,* this study became known as the Campbell Report. (Box 5, File 4A, Nos. 16 and 17.) One aspect of this wide-ranging study was a review of interracial education. The Campbell Report stated, *"[W]e recommend that the Cincinnati School System should work toward the provision of high quality integrated education for all children under its jurisdiction." Id.* at 91. (Emphasis in original.) The Campbell Report recommended, *inter*

*alia,* experimental programs and concluded that "Cincinnati should develop plans for gradually integrating all its schools, to the limits that the geographic distribution of its population permits." *Id.* at 91–92.

4. As a result of the Campbell Report, a number of community-wide task forces were established to review its recommendations. One such group was the Task Force Committee on Education and Race, which in March, 1969 recommended, among other things, that the Board of Education declare it to be "the policy of the Cincinnati Board of Education that quality integrated education is the highest goal of the Cincinnati Public Schools." [9] (Box 1, Folder 1, No. 11 at 38.) In furtherance of this goal, the Board adopted several integrative program goals, which are summarized in the findings below.

5. On June 8, 1970 the Planning Program and Organization Committee of the Cincinnati Board of Education reported that it believed that the Board should include among its stated goals that of fostering better intercultural understanding. At the June 8, 1970 meeting the Board also resolved to consider as one of its program goals "the provision of quality interracial and intersocio-economic educational experience for both the student and the teacher of the Cincinnati Public School System, thereby giving both the student and the teacher a more realistic knowledge of the multi-cultural nature of our society." (Box 6, Folder 4, Board Minutes of June 8, 1970 at 225.)

6. On June 29, 1970 the Board adopted the following statement as part of its "Program Goals for 1971":

F. *Intercultural Understanding.*

It is basically desirable to have intercultural, interracial, and intersocio-economic understanding for all students in order to prepare them for citizenship in a pluralistic and democratic society and to foster cooperation and understanding rather

---

9. This was the origin of the policy statement adopted by the Board March 26, 1973 (Box 6,

Folder 5). See *infra* Finding 8.

than friction and misunderstanding within the schools themselves.

Therefore, it will be one of the goals of the Cincinnati Board of Education to provide interracial and intersocio-economic educational understanding for both the students and the teachers of the Cincinnati Public School system thereby giving the students and the teachers a more realistic knowledge of the multi-cultural nature of our society.

Recognizing that provincialism contributes to misunderstanding among groups separated by geography as well as other factors, the schools must devise methods for regular dialogue among representatives of different areas, bringing differences and even conflicting views into the open discussion and examination.

Better intercultural understanding comes about as a result of effective communication among staff, community, and students who share in the development of common goals. Effective programs to do this job are very difficult to devise; yet the community looks more and more to the schools to help solve problems which might have their roots in the community. One suggested approach to the problem is to strengthen present community associations. Such associations may provide the needed medium of communication among staff, parents, community and students in the local school context. Much work has been done and much work still has to be done in the area of human relations, and it requires the wholehearted involvement of all groups concerned if it is to succeed.

Ohio law requires the equal opportunity for every child to attend the most convenient school regardless of race, creed or national origin. With this in mind, the Board of Education supports the neighborhood school concept. Nothing in the goal set forth in this Section F shall conflict with the legal requirement of convenience nor require the voluntary or involuntary transportation of students.

(Box 6, Folder 4, Board Minutes of June 29, 1970 at 255.)

7. On July 10, 1972 the Board authorized the appointment of a Task Force to Study Racial Isolation. (Box 6, Folder 5, Board Minutes of July 10, 1972 at 358.) Pursuant to Board action on September 11, 1972, the Division of Research, Statistics and Information prepared a report in which they classified schools according to the feasibility of relieving overcrowding through school district changes. Redistricting a school district was not regarded as a feasible alternative, however, "if it seemed likely that nearly all pupils transferred would be of one race and would in the situation under review tend to increase segregation in any school affected." (Box 5, Folder 6A, No. 7.)

On December 11, 1972 the Board adopted the Policy on Grouping. (Box 6, Folder 5, Board Minutes of December 11, 1972 at 483.) On February 26, 1973 it received the Majority and Minority Reports of the Task Force to Study Racial Isolation. (Box 7, Folder 3, Nos. 11 and 12.) The Task Force members differed in their views, with the result that the Majority Report contained three alternative proposals and the Minority Report presented a view which differed substantially from that expressed in the first two alternatives of the Majority Report.

After the Board's receipt of the Task Force's Reports, on March 12, 1973, Board member Robert S. Brown made the following statement which appears in the minutes of the Board meeting of that date:

The Board of Education should *not impose* any method upon the school system, including busing, to achieve racial balance. The Board's duty is to *foster* joint participation by schools and communities in recognizing and resolving educational inequities. Without mutual planning and support for acceptable and effective methods, we face the specter of the least acceptable method of all—court-ordered busing, with all its limitations. We know of no community, black or white, in Cincinnati which favors this alternative.

(Box 6, Folder 5, Board Minutes of March 12, 1973, emphasis in original.) [10]

8. On March 26, 1973 the Board of Education adopted a formal policy statement, based upon the language of the 1968 Campbell Report and the Task Force Report on Education and Race, as follows:

> Quality integrated education is the highest goal of the Cincinnati Public Schools. While this purpose shall remain clear, devices used to achieve this goal may vary with time and circumstances. Whenever a relevant decision is to be made, the potential for achieving integration shall be assigned a high priority.

Board Policy No. 5145.1. (Box 6, Folder 5, Board Minutes of March 26, 1973.) On that same date member Brown made the following statement:

### STATEMENT OF MEMBER BROWN

One of the unfortunate aspects of the current debate of the Racial Isolation Report is the degree to which the superficial and inflammatory issue of busing, has been permitted to obscure the paramount tragedy of segregation. I have no brief for busing except as the only method so far conceived to get children from their homes to their schools. If another way could be found, Cincinnati would not spend $1,600,000 per year, to transfer children to their "neighborhood schools."

While it is self-evident that solutions, enjoying public support and acceptance, should be adopted, as far as possible, tangential concerns, such as transportation, should not be permitted to eclipse the urgency of the problem itself. An excellent educational program in an integrated setting should be, to my mind, the most critical priority of this school board. Recent events, however, have left me unclear as to whether this priority is shared by other Board members. For that reason I recommend for adoption, the attached policy statement based on the 1968 Task Force on Race and Education, which examined the recommendations in the Campbell Report, to replace the March 1964 statement of the Board. This statement, with which board members have long been familiar, does not, as this Board should not, take any positions with respect to questions of methodology such as busing, magnet schools, or redistricting. Those issues should be resolved gradually on a pragmatic basis. It does make clear the urgency of integration as an integral part of "quality education" and justifies the careful deliberation on which we should now embark.

*Id.* at p. 99.

9. On July 9, 1973 the Superintendent reported to the Board about steps being taken for reducing racial isolation, which were as follows:

### PROPOSAL FOR REDUCING

### RACIAL ISOLATION

On March 26, 1973, the Board of Education adopted as policy "... that quality integrated education is the highest goal of the Cincinnati Public Schools. While this purpose shall remain clear, devices used to achieve this goal may vary with time and circumstances. Whenever a relevant decision is to be made, the potential for achieving integration shall be assigned a high priority."

As a matter of record, the Administration wishes to report that the following is the first step toward implementation of that policy and includes plans that will involve staff and students in September, 1973.

The incidence of racially identifiable staff will be reduced through attrition and transfer. New teachers will be assigned to school on the bases of: 1) their area of training and certification, and 2) their race. The intent will be to have the racial balance of each school staff approach the racial composition of the staff of the entire school system with ten percent leeway in either direction. A num-

---

**10.** This is noted in part because Brown was one of the supporters of the December 10, 1973 busing order. *See infra,* Finding 12.

ber of years will be required to reach this goal through attrition; therefore, we will work with teachers and the recognized teacher organization to encourage volunteer transfers so that the goal will be reached as rapidly as possible.

An open enrollment plan for students will be implemented in September, 1973, under the following conditions: 1) that the receiving schools have available space, and 2) that the transfers will improve racial balance.

Those schools which are not enrolled to capacity have been identified. Numbers of students the school may receive and the racial composition of students acceptable to the receiving school have also been identified. Exemplary programs, alternate forms of education, and courses unique to a receiving school will be identified.

Parents and students will be encouraged, but not coerced, to take advantage of this opportunity.

(Box 6, Folder 5, Board Minutes of July 9, 1973 at 300.) On that same date Board member Ronald Temple made a statement opposing the foregoing proposal. That statement concluded:

In sum, I have concluded that the only systematic educationally sound way to attack the problem of racial isolation and educational reform is through racially balanced *alternative programs and schools.* Ultimately this would include every school in the district. Practically, let us make a beginning this September.

*Id.* at 302 (emphasis supplied.) [11]

10. On August 1, 1973 Superintendent Waldrip notified the teaching staff of the inauguration of the Board's staff balancing policy commencing September 1, 1973. His letter of that date states, in part:

On July 9 I set before the Board of Education and Cincinnati citizens my suggestions for reducing racial isolation within our schools. Toward that end we are inaugurating in September, 1973, a voluntary open enrollment procedure for students. We would like also to offer staff members a similar opportunity.

(Box 7, Folder 4, No. 2.)

## B. THE EMERGENCY SCHOOL AID ACT

11. By July 1973 the Board began to formulate an application for funding under the Emergency School Aid Act (ESAA), 20 U.S.C. §§ 1601–19, which had been enacted in 1972.[12] (Box 1, Folder 5, No. 1). The ESAA was intended to aid school districts in the voluntary reduction of minority group isolation. It included the following statement of "Congressional findings and purpose:"

a) The Congress finds that the process of eliminating or preventing minority group isolation and improving the quality of education for all children often involves the expenditure of additional funds to which local educational agencies do not have access.

b) The purpose of this chapter is to provide financial assistance—

1) to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools;

2) to encourage the voluntary elimination, reduction or prevention of minority group isolation in elementary and secondary schools with substantial proportions of minority group students; and

3) to aid school children in overcoming the educational disadvantages of minority group isolation.

20 U.S.C. § 1601 (1974 Supp. IV).

The ESAA also expressed support for neighborhood schools, providing "Nothing in this chapter shall be construed as requiring any local educational agency which assigns students to schools on the basis of geographic attendance areas drawn on a

---

**11.** This is noteworthy because Temple introduced and supported the December 10, 1973 busing order. *See infra* Finding 12.

**12.** The Emergency School Aid Act has been repealed. *See supra,* note 1. Consequently, there is no longer any mechanism for reviewing ESAA applications or distributing ESAA funds.

racially nondiscriminatory basis to adopt any other method of student assignment." 20 U.S.C. § 1618 (1974 Supp. IV). Moreover, ESAA prohibited the Act from being construed as requiring "the assignment or transportation of students or teachers in order to overcome racial imbalance." 20 U.S.C. § 1652 (1974 Supp. IV).

12. The Emergency School Aid Act grants were administered by HEW's Assistant Secretary for Education. Applications for ESAA funds were processed by Office of Education staff subject to the Act's provisions and the administrative guidelines adopted by the Office of Education pursuant to the Act, 45 C.F.R. § 185.01 *et seq.* (1974). The Act provided for basic grants, 20 U.S.C. § 1605(a)(1),[13] and pilot grants, 20 U.S.C. § 1605(b).[14]

The ESAA grant process involved two facets. First, was the "civil rights" portion of the review which established the school district's eligibility for assistance. The criteria for eligibility were set forth in 20 U.S.C. § 1605 and in the corresponding regulations at 45 C.F.R. § 185.11. These provisions generally required that the school district had implemented (or would, if assistance was made available) a desegregation plan aimed at eliminating, reducing or preventing foreseeable minority group isolation in the schools.[15] Once this "basic" eligibility was established, it was necessary

to determine if any of the "limitations on eligibility" of 45 C.F.R. § 185.43 applied.

The "limitations on eligibility" provided that an educational agency was ineligible for assistance if it had transferred property to discriminatory nonpublic schools, § 185.-43(a), if it had demoted or dismissed minority group personnel, § 185.43(b), if it had or maintained class assignment procedures resulting in classroom segregation, § 185.-43(c), or if it discriminated in other ways against children, § 185.43(d).[16]

The determination of whether a school desegregation plan met those eligibility criteria was made entirely by the Office of Civil Rights (OCR) and presented to the Office of Education for routine adoption. Deposition of Mary Jane Calais, at 8, 10. The chief OCR investigator who reviewed Cincinnati's eligibility for ESAA funding was Ortha O. Barr, Jr., a Civil Rights Specialist in HEW's Cleveland office. He reported to the Director of the Cleveland OCR office, Ruth Hart Stromberg. Stromberg's immediate supervisor was OCR Regional Director, Kenneth A. Mines, who in turn reported to the OCR Director in Washington.

The second prong of the grant process was an evaluation of the eligible proposals according to criteria set forth in 20 U.S.C. § 1609(c), and detailed in the objective guidelines set out at 45 C.F.R. § 185.14.

**13.** Basic grants are awarded to school districts for specific activities authorized under Section 1606 of the Act which support the implementation of a desegregation plan; a plan for the elimination, reduction, or prevention of minority group isolation; an interdistrict transfer plan, or a plan to establish or maintain one or more integrated schools.

**14.** Pilot grants are awarded for unusually promising projects designed to overcome the adverse effects of minority group isolation by improving the academic achievement of children in schools with a minority group enrollment in excess of 50 percent. In order to receive a pilot grant, a school district must be eligible for a basic grant and have a minimum number or percentage of minority group students, 20 U.S.C. § 1606(b), 45 C.F.R. §§ 185.21–185.24. Cincinnati did not apply for a pilot grant in 1974, but did in 1976.

**15.** Section 185.11 sets forth the criteria making a local educational agency (LEA) eligible for assistance under ESAA's basic grant program.

It provides, *inter alia,* that an LEA may apply if it has "a plan for the complete elimination of minority group isolation in all the minority group isolated schools," § 185.11(b)(1). An LEA is also eligible if its plan will "eliminate or reduce minority group isolation in one or more of the minority group isolated schools of such agency, or . . . reduce the total number of minority group children who are enrolled in minority group isolated schools." § 185.11(b)(2). Moreover, an LEA is eligible if its plan would "prevent minority group isolation reasonably likely to occur (in the absence of assistance . . . ) in any school operated by such agency in which school at least 20 percent, but not more than 50 percent, of the enrollment consists of minority group children." § 185.11(b)(3).

**16.** Cincinnati was found to be ineligible for all four of these reasons in both 1974 and 1976. See *infra* Findings 47 and 48.

These criteria included "objective" factors, such as the need for ESAA funds as indicated by the number of minority children in the district compared to other districts in the state, and the effective net reduction to be accomplished by the plan. There were also "educational and programmatic" factors, including the proposed activities, staffing, delivery of services, parent and community involvement, and resource management. 45 C.F.R. § 185.14(a), (b). Each proposal within a state was reviewed by a non-federal panel, including persons from inside and outside the state, who were of different races, and who were either community members or educational professionals.

Once these evaluations were completed, the proposals which had been determined to be eligible by OCR in each state were ranked according to their scores and funded in the order of their ranking. ESAA's "funding criteria" required that the limited available funds, (which had been apportioned among the states), be awarded to applicants "from a State ... in the order of their ranking on the basis of the criteria set out in this section until the sums allotted to such State" were exhausted. 45 C.F.R. § 185.14(c)(2). If all of the money allocated to each state was not thereby exhausted, the remaining money was reallocated to eligible projects elsewhere.

## C. CINCINNATI'S 1974 ESAA PROPOSAL

13. On August 2, 1973 representatives of the Cincinnati public schools, including Superintendent Donald R. Waldrip and Assistant Superintendent John Grate, met in Chicago with several ESAA program officers, officials from the Office of Civil Rights (OCR), and Mary Jane Calais, Regional Commissioner of the U.S. Office of Education (OE), Region V. (Box 1, Folder 5, No. 2.) The Cincinnati officials discussed their plan for ESAA funding, with particular attention on their desegregation plan. *Id.* According to the uncontroverted affidavit of John Grate, "At this time the affirmative actions of CBE [Cincinnati Board of Education], namely, voluntary transfer, staff assignment and the Aiken building

program to reduce racial isolation were discussed and supportive documents transmitted. Dr. Waldrip and Mr. Grate were advised that these actions formed the basis of eligibility for ESAA funds and were encouraged to pursue application for funds." Affidavit of John Grate, September 20, 1974, Attachment to Document 11, at 1. [Hereinafter 1974 Grate Affidavit.]

14. On August 6, 1973 Waldrip wrote to Calais indicating that Cincinnati intended to file its "application at the earliest possible funding opportunity." (Box 1, Folder 5, No. 3.) He indicated that Cleveland OCR officials viewed the Board-approved plans to reduce racial isolation through staff assignments, student transfer, and school building construction as constituting "the beginning of eligibility." *Id.* Moreover, Waldrip informed Calais that "[o]ne component of our plan calls for voluntary student transfers with alternative and exemplary programs representing incentives." *Id.* Waldrip expressed his eagerness to obtain 1974 ESAA funds in order to "enhance our chances of success in the first year of our program to initiate ESAA programs to attract children and parents into the schools involved in the voluntary transfer program." *Id.*

15. In September, Grate and other members of the Board staff attended meetings conducted by Ohio Department of Education and HEW officials to learn of ESAA guidelines and procedures for making application. 1974 Grate Affidavit at 1.

16. On October 5, 1973 a letter of Intent to Apply for ESAA funds was filed with Louis Irons, EEO Program Manager, U.S. Office of Education Region V. *Id.*

17. In October the Board adopted the Report of its Facilities Committee which recommended that approximately $1.4 million "be expended to enlarge the capacity and enhance the design of the new elementary school in the Cheviot-Midway-Westwood area so as to permit construction of a magnet school which will reduce racial isolation." (Box 6, Folder 5, Board Minutes of October 8, 1973.)

18. On October 24, 1973 the Superintendent's Administrative Conference decided to focus the ESAA program on an Aiken High School District Instructional Component, a Staff Development Component, and a magnet school component. 1974 Grate Affidavit at 2.

19. John Grate headed the proposal development task force which began preparing the manuscript and collecting the necessary data. *Id.*

20. On November 13, 1973 Grate telephoned an unidentified Equal Opportunity Specialist in HEW's Chicago office to inquire about assurances needed for the ESAA application. (Box 1, Folder 5, No. 5.)

21. During November the eligibility and program components of the Board's application were the subject of meetings with school administrators and consultants, the Aiken Internal Task Force, the District-Wide Advisory Council made up of community and neighborhood representatives, and personnel from the Ohio Department of Education. 1974 Grate Affidavit at 2.

■ 22. At this time the Cincinnati Board of Education included Robert S. Brown, Janet S. Duff, Rev. Tecumseh X. Graham, Virginia K. Griffin, Charles D. Lindberg, Mary T. Schloss, and Ronald J. Temple. School Board elections in November, 1973 resulted in the election of two new members, scheduled to take office in January, 1974. The new Board was considered to be more conservative regarding integration than the outgoing Board. The so-called "liberal" Board members, including Brown, Duff, Graham, and Temple, re-

portedly believed "that the 'conservative' board would be unlikely to continue the steps already taken toward reduction of racial isolation in the school district." "Board May Integrate Schools," *Cincinnati Post*, December 10, 1973.[17] (Box 6, Folder 7, No. 1.) Brown was quoted as having said that the Board election results showed that reduction of racial isolation on a gradual basis was an option "no longer open to us." *Id.*

23. At the December 10, 1973 Board meeting, member Ronald J. Temple moved for the adoption of a "Resolution Ordering the Racial and Economic Integration of Pupils in the Cincinnati Public Schools." (Box 6, Folder 5, Board Minutes of December 10, 1973 at 459.) The resolution called for the rescission of school district lines, assignment of children to schools on the basis of race and family income, and busing to achieve that racial and economic integration by September 1, 1974.[18] *Id.* Lame-duck Board members Graham and Duff joined Temple and Brown in voting for the adoption of the resolution. *Id.*

At the same meeting, Superintendent Waldrip recommended that the Board apply for ESAA funds by the December 26, 1973 deadline. *Id.* at 469.

24. During December a draft of the ESAA application was submitted to schools, central administration, and the District-Wide Advisory Council for review and comment. 1974 Grate Affidavit. A Public Hearing was held on December 17, 1973. (Box 1, Folder 1, ESAA Application at VI–8, 1–23.)

---

17. Ordinarily newspaper articles would not be discussed in a judicial opinion such as this. All of the articles cited herein were in HEW files, however, indicating HEW's awareness of and interest in the views expressed in them. We therefore think they are appropriate sources of information concerning the bases for HEW's decisions.

18. It was widely believed that the introduction and passage of this resolution was motivated in part by the expectation that the Board elected to take office in January, 1974 would repeal the plan which would, in turn, ultimately result in court-ordered intergration. On December 13, 1973 *The Cleveland Press* reported that "[t]here is some speculation that the liberals on the

current Board intend the resolution more as a device to set up the conservative-dominated board for a desegregation suit rather than as a lasting statement of policy." (Box 1, Folder 1). A December 15, 1973 editorial in *The Cincinnati Herald* indicated that "[t]he action can also bring federal courts into play where the decision will be based on law." (Box 6, Folder 7, No. 4). At that time it was also generally believed that repeal of a plan to bring about integration was in and of itself an act of unconstitutional segregation. *See, e.g.,* "Board May Integrate Schools," *Cincinnati Post*, December 10, 1973 (Box 6, Folder 7, No. 1), and Part IV A of this Opinion.

25. Cincinnati's application for ESAA funding was submitted on December 26, 1973. (Box 1, Folder 1.)

### (1) CINCINNATI'S ELIGIBILITY FOR FUNDING

26. Two days after the submission of Cincinnati's proposal, on December 28, 1973, a form titled "OCR Verification of Applicant's Plan Status" was completed by the Office of Civil Rights. (Box 1, Folder 1.) The form indicated that the Board could be considered for ESAA assistance because it "has adopted and is implementing" a plan "to eliminate or reduce minority group isolation in one or more of [Cincinnati's] minority group isolated schools," as required by 45 C.F.R. § 185.11(b)(2).

27. Cincinnati's desegregation plan was described in Section II of the application, entitled "Plan for Reducing Racial Isolation." According to the application, Cincinnati's eligibility for ESAA funds was "built upon the implementation of voluntary plans to reduce minority group isolation in the school district." *Id.* at II-1. Three specific plans were cited as having been implemented or being in the process of implementation to reduce or prevent racial isolation, including a building program, transfers of staff, and an open enrollment plan. *Id.*

The Board's December 10, 1973 Resolution was included as the last two pages of this section, at II-15 to 17, but this plan was otherwise neither integrated into the application, nor even mentioned. For example, the ESAA Program Overview on IV-25 indicated that there were three components to it, *viz*, the Aiken Area Instructional Component, Staff Development, and Magnet Schools; there is no mention of compulsory busing or the elimination of all neighborhood school districts. The Timetable of Major Events in the ESAA Program, listing steps necessary for its preparation and implementation, at IV-116 to 119, makes no mention of the assignment of students to schools on racial and economic bases, nor of the September 1, 1974 deadline for achieving that goal via compulsory busing.

■ We think it significant that there is no indication in the entire ESAA application of any procedures to implement the December 10 Resolution or to make it a part of the plan for reducing racial isolation. Thus we disagree with defendants, and find that despite its inclusion in the application, the December 10 Resolution did not constitute an integral part of Cincinnati's overall program for achieving desegregation.[19] (Cf. Doc. 79 at 7.)

28. At its regular meeting on January 14, 1974 the Board approved a Plan for Quality Integrated Education. Five Board members, including Robert Braddock, Virginia K. Griffin, Henry Kasson, Mary T. Schloss, and Charles D. Lindberg, voted in favor of the resolution while Robert S. Brown and Ronald J. Temple opposed it. (Box 6, Folder 6, Board Minutes of January 14, 1974 at 15.) In addition, the Board approved some Findings concerning the December 10 "Brown-Temple" Resolution, including assertions that the Resolution had not been in good faith, that it was "incomplete, inaccurate, misleading, and erroneous," that it was unworkable and inadequate, and that it resulted in unclear and conflicting directives. *Id.* at 9–13.

29. The Plan for Quality Integrated Education adopted in January 1974 had the following features:

a) Mandatory balancing of teaching staff by September 1, 1974, so that each school's teaching staff would substantially approximate the racial balance of the teaching staff district wide.

b) An immediate affirmative action program for hiring of non-professional personnel, such that the racial balance of the non-professional staff approximate the racial balance of the adult population of the school district.

c) An immediate affirmative action plan arrived at by substantially increasing the percentage of black administrators

---

**19.** We also recognize that this conclusion differs somewhat from that expressed by this Court in 1975 when we noted "that the integration plan before the HEW contained, apparently as an integral part, the December 10, 1973 Board resolution." 396 F.Supp. at 215.

and supervisors within the school system, to continue even during times of staff reduction.

d) An expansion of the Open Enrollment Program, whereby students could transfer to another school if that school had the capacity and if the transfer would improve racial balance.

e) An expansion of the Alternative Schools Program.

f) An increase in the opportunity for interracial interchanges among students.

g) An attempt to cooperate with other school districts to insure quality integrated education to all students in the metropolitan area.

h) An across-the-board effort to upgrade the quality of education in all schools.

*Id.* at 13–15.

30. The day after the Board's adoption of the Plan, HEW's Equal Opportunity Specialist O.O. Barr wrote to J.C. Johnson, President of the Cincinnati Chapter of the NAACP. (Box 1, Folder 5, No. 8.) Barr indicated that he had been unable to reach Johnson by telephone at the Cincinnati NAACP office, and that he was "most anxious" to speak with Johnson "concerning the situation in the Cincinnati Public Schools." *Id.*

Mr. Barr did talk with Johnson January 18, 1974 (Box 1, Folder 5, No. 11). Barr then wrote to Johnson on January 21 to request a meeting with him in Cincinnati during the week of March 4. *Id.* In that letter Barr requested that Johnson advise him "in the event your organization files

any legal actions against the Cincinnati School Board." [20] *Id.*

31. On January 18, 1974 Barr also called John Grate about the need for additional information to establish Cincinnati's ESAA eligibility. (Box 1, Folder 5, No. 9.) That same day Ruth Hart Stromberg (Chief of HEW's Elementary and Secondary Education Board OCR, Cleveland) wrote to Superintendent Waldrip reiterating Barr's message about the importance of providing additional information. *Id.* Although Stromberg's six-page letter set forth ten points about which she sought additional information, she was most concerned with Part I which she labeled, "Implementation of Desegregation Plan." Under that heading, she indicated that "there is a serious question" whether Cincinnati had "satisfied the eligibility for assistance requirements as set forth in Section 185.11 of the Regulations." [21] *Id.* She also stated that "[i]t was most important" to receive the material requested in Part I of the letter as soon as possible." *Id.* In Part I, Stromberg acknowledged that "the district's application does not specifically allege reliance upon the desegregation plan adopted by the Board of Education on December 10, 1973," but she nonetheless wanted information about the steps underway or projected for its implementation. *Id.* She also told Waldrip that he should contact Mr. Barr if he had any questions.

32. Mr. Grate sent some of the requested material to Mr. Barr on February 1, 1974. (Box 1, Folder 5, No. 13.) As of February 8 Stromberg had not received it, however, and she wrote to Waldrip, empha-

---

**20.** Although HEW maintains that their contacts with the NAACP prior to the March 4, 1974 meeting "involved no discussion of substantive issues," doc. 79, footnote at 10, this quote from Barr's letter reveals a key concern of HEW. Indeed, it appears to have been widely known that the NAACP intended to file suit in federal court if and when the Board rescinded the December 10 resolution. *See, e.g.,* "Board to supercede integration proposal," *Cincinnati Post,* Jan. 10, 1974 (Box 6, Folder 7, No. 6). The day after the Board adopted its new desegregation plan, another newspaper reported that the Board had thereby "set the stage for probable later court action." "Board Approves New Desegregation Plan," *Cincinnati Enquirer,* January 15, 1974 (Box 6, Folder 7, No. 10). The article

went on to say that Board members Brown and Temple "predicted the board's action will result in a desegregation suit being brought against the school district." *Id.*

**21.** This is surprising in light of the December 29, 1973 finding by OCR that Cincinnati could be considered for ESAA funds because its adoption of a desegregation plan had been found to make it eligible within the meaning of 45 C.F.R. § 185.11(b)(2). See Finding 26. Ultimately OCR did conclude that Cincinnati was eligible under section 185.11 but ineligible due to violations of section 185.43. See Findings 35 and 4746.

sizing "the absolute necessity of furnishing evidence at the earliest possible time that the provisions of Section 185.11 of the Regulations have been satisfied. This matter is quite urgent because until such time as your District has demonstrated that it has met the eligibility requirements of Section 185.11, there is no basis for conducting a further review." [22] (Box 1, Folder 5, No. 15.) The requested material had apparently been addressed incorrectly. (Box 1, Folder 6, No. 16.) Replacement materials were sent February 11 and additional materials were sent February 20. (Id., Nos. 17, 18.) Mr. Barr requested additional information and documents on February 22, 1974. (Id., No. 20.)

33. HEW sent an OCR review team to conduct an on-site civil rights eligibility review from March 4–7, 1974. On the first day of that review Barr met with NAACP representative Johnson as prearranged through correspondence dated January 21, January 28, February 2, and February 28 (Box 1, Folder 6, Nos. 10, 11, 14 and 22.) The notes from the meeting are brief, but they indicate that Barr and Johnson discussed discrimination in private schools and the impact of some proposed budget reductions on teacher in-service training and special programs.[23] (Box 1, Folder 5, No. 24.)

22. Apparently HEW was questioning the existence of any desegregation plan at all, which would have barred Cincinnati from even being considered for ESAA funding. See Finding 12. At this time, however, Cincinnati had already received "turn-around" approval regarding basic eligibility, Finding 26, and it was ultimately decided that they were eligible. Finding 35.

23. A newspaper article gave a different account of these contacts, stating that:
... civil rights leaders are said to have told the investigators that HEW could end up in an awkward position of having given money to a school district that is going to be sued in federal court on allegations that it is unconstitutionally segregated.
(Leaders·of the Cincinnati Chapter of the National Assn. for the Advancement of Colored People have said they will file suit against the board because of its decision to ignore the liberals' integration plan in favor of a conservative approach.)
"U.S. studies school race balance plan." Cincinnati Post, March 7, 1974 (Box 6, Folder 7, No. 12).

Barr was also given the telephone numbers of Mr. and Mrs. Spencer. Id.

34. On March 7, 1974 the OCR review team met with Superintendent Waldrip, John Grate, and James Jacobs for a closing conference. The typed minutes of the meeting prepared by Barr and another OCR representative indicate that the plaintiffs were advised of specific additional materials needed to assure technical compliance. (Box 1, Folder 5, No. 25.) With regard to "Implementation of Desegregation Plan," Waldrip was told to keep OCR "fully informed regarding any and all steps taken to implement any desegregation plan." Moreover, he was told that "[t]his is a potential legal problem in view of the 6th. Circuits [sic] position regarding implementation of desegregation plans." Id.

When Waldrip asked "whether it would have been better to have left the December 10, 1973 Resolution out of the Application," he was told that it would have made no difference "because the passage of the Resolution was a matter of record." Id. In response to Waldrip's question as to "whether the adoption of the January 14, 1974 Resolution made the District ineligible," he was informed that "this was a legal question" and that "OCR only gathered the facts." [24]

This account is corroborated by statements attributed to Johnson which appear in a March 29, 1974 memorandum from Stromberg to Mines. (Box 1, Folder 5, No. 38.) In that memorandum it says that Johnson "verbally informed the review team" that the NAACP was going to sue the school district. Id. Moreover, Johnson told the review team that he personally believed the Board was ineligible for and should not be granted ESAA funds. Id. See also discussion infra Finding 40.

24. This statement is particularly interesting in light of a statement made by Louis M. Irons (E.E.O. Program Manager, Office of Education, Region V, HEW), in a March 12, 1974 letter to Rev. Otis Moss, Jr. of P.U.S.H. (People United to Save Humanity) in Cincinnati. (Box 1, Folder 5, No. 28.) Rev. Moss had written two letters in February 1974 requesting information. In the letter dated February 28, 1974 to Mr. Irons, Rev. Moss stated that he understood the Board had applied for ESAA funds to "aid in implementing programs pursuant to the plan for pupil desegregation as adopted by the Board on December 10, 1973." He asked about the legality of the

35. Although it is unclear from the record when the "Title VII ESAA Review Report" (Box 1, Folder 4) resulting from this inspection was actually completed, the Report refers to events as late as April 18, 1974, so it could not have been completed prior to the date.[25]

The ESAA Review Report indicated that Cincinnati's "[b]asic ESAA eligibility was founded upon implementation of an Open Enrollment Plan beginning September 1973." Id. Although the "very minimal" reduction of minority group isolation resulting from this plan did not make Cincinnati ineligible for funding, the Report indicated that it would have "funding implications." [26] The Report indicated that Cincinnati was not in compliance regarding transfer of property, faculty assignments, racially isolated classes, nondiscriminatory assignment of students to classes, and other discriminatory treatment. The other discriminatory treatment was the Board's January 14 action "to delay, impede or obstruct lawful implementation of a desegregation plan and that it therefore constituted an unconstitutional segregative act." Id.

36. On March 11, 1974 J.C. Johnson and Marian Spencer of the Cincinnati NAACP wrote to Barr setting forth their organization's position regarding the Board's ESAA application. (Box 1, Folder 5, No. 26.) In that letter they asserted that the ESAA application as filed had two major thrusts, the first of which was the implementation of the December 10, 1973 desegregation plan. Id. The NAACP believed that the Board's adoption of its January 14, 1974 plan "effectively rescinded" the December plan and constituted "an attempt to avoid rather than encourage integration." Therefore, they felt "that to fund with ESAA monies any proposal based on that plan would be ... contrary to the purpose of the act." Id.

37. On March 13, 1974 Stromberg wrote to Kenneth Mines, Region V, OCR Director, informing him that "[t]he initial 48–hour turnaround decision establishing basic eligibility [27] of the Cincinnati Public Schools was based on the December 10, 1973 resolution of the Cincinnati School Board to completely desegregate the schools by September, 1974." [28] (Box 1, Folder 5, No. 31.) Stromberg noted that the ESAA application had included "[r]eference to an Open Enrollment Plan" and that the new school board's decision not to implement the busing resolution made their eligibility contingent on the open enrollment plan. She noted that this plan had achieved "minimal reduction in minority group isolation" in the few months since its institution in September 1973. Consequently, she suggested that the plan's limited effectiveness, which

---

Board submitting an ESAA application "based primarily upon a student desegregation plan that it does not plan to implement." (Box 1, Folder 5, No. 23.) Mr. Irons indicated that this question "requires a very simple answer. If the Cincinnati School District resends [sic] the Desegregation Plan they will no longer be eligible for funding. The Office for Civil Rights is acquainted with the situation occurring there now and they will keep us properly informed about their eligibility and their compliance." Id.

**25.** A copy of the Report was not sent to Mary Jane Calais, OE's Regional Commissioner, until May 20, 1974, after Cincinnati had been found ineligible and this lawsuit was initiated. (Box 1, Folder 5, No. 62.)

**26.** See infra Finding 37.

**27.** As we understand it, basic eligibility refers only to the requirement of 45 C.F.R. § 185.11 that some kind of desegregation plan be implemented or planned. This does not mean that there has been a determination that there is compliance with the "Limitations on Eligibility" set forth at 45 C.F.R. § 185.43. See supra Finding 12.

**28.** This seems an implausible explanation for HEW's initial conclusion that Cincinnati was eligible. If HEW was really making the December 28 eligibility decision on the basis of the December 10 resolution calling for complete desegregation by September 1974, it would have been appropriate for them to consider Cincinnati eligible within the meaning of § 185.11(b)(1). Section 185.11(b)(1) provides for eligibility if a district "has adopted and is implementing ... a plan for the *complete* elimination of minority group isolation in *all* the minority group isolated schools of such agency." (Emphasis added.) Instead, OCR found Cincinnati to be eligible because it adopted a plan to "eliminate or *reduce*" minority group isolation in *one or more* " minority group isolated schools. (Emphasis added.)

was an important factor in funding decisions under 45 C.F.R. § 185.14(a)(2),[29] should be brought to Mines' attention.[30]

38. On March 19, 1973, Kenneth Mines and Mary Jane Calais of HEW's Chicago office, notified Waldrip that they had not yet received the material requested in Stromberg's January 19, 1974 letter to Waldrip. (Box 1, Folder 5, No. 33.) Because of the inability of Cincinnati to furnish the material until the week of March 25, 1974, when some funding decisions were to be announced, Cincinnati's eligibility determination was being postponed until April. *Id.*

39. One component of Cincinnati's ESAA plan was the reduction of racial isolation through transfers of teachers to achieve staff balance in each school approximating that of the overall teaching staff. *See* Box 6, Folder 5, Board Minutes of July 9, 1973; Box 7, Folder 4, No. 2; Box 1, Folder 1 (ESAA Application). In January, 1974 when the Board adopted a mandatory staff balancing policy to be fully implemented by September 1974 (Box 6, Folder 6, Board Minutes of January 14, 1975), there was some discontent among teachers and the general public.[31] In response to this community pressure, the Board modified its mandatory staff balancing plan on March 18, 1974. As modified, the plan provided that no more than twenty percent of the staff of any school would be transferred in any year to achieve staff racial balance. (Box 6, Folder 6, Board Minutes of March 18, 1974.)

Barr called Waldrip on March 24, 1974 to request information on this change. The information was sent March 27. (Box 1, Folder 5, No. 33.) On March 29 Barr again called Waldrip, this time to arrange a meeting to discuss the change. (Box 1, Folder 5, Number 37.) The meeting was scheduled for April 3. *Id.*

40. On March 29, 1974 Stromberg wrote an Action Memorandum to Kenneth Mines entitled: "Proposed Letter Finding Cincinnati Public Schools, Cincinnati, Ohio Ineligible for Funding under Its Title VII ESAA Application and In Violation of Title VI." (Box 1, Folder 4, No. 38.) The *only* issue discussed was whether the Board's January 14, 1974 decision not to implement the December 10, 1973 resolution constituted discrimination against children as defined in ESAA regulations.[32] *Id.*

A prominent theme in the memo was the attitude of the Cincinnati NAACP. *Id.* at 1–2. Stromberg noted that NAACP President Johnson had told the ESAA review team that the NAACP was going to file suit against the District for its failure to implement the December desegregation

---

**29.** We think it is significant that the Regulation cited by Stromberg did not limit itself to the effective net reduction in minority group isolation *already* accomplished, but rather it included the reduction "to be accomplished by the implementation of a plan." In light of the fact that Cincinnati was seeking assistance in making open enrollment and magnet schools more effective, the small degree of its effectiveness during its first year seems either irrelevant or evidence of their great need for funding assistance in order to achieve desegregation.

Moreover, a school district could be eligible for ESAA assistance under 185.11(b)(2) as long as it would reduce minority isolation in "one or more" schools.

**30.** If OCR and OE review processes were indeed independent, it is unclear why Stromberg felt it important to notify Mines about something which was not a factor in determining civil rights eligibility, but rather concerned programmatic evaluation and funding decisions.

**31.** One newspaper reported that 30 to 50 percent of the faculty in several predominantly black schools would have to be transferred to predominantly white schools under the plan. "Teachers strike over Cincy plan." *Cleveland Plain Dealer,* March 13, 1974 (Box 6, Folder 7, No. 13). Apparently the policy was opposed by some civil rights officials, black teachers, and black parents "unless ... [it were] accompanied by a full-scale integration of pupils." *Id.* See also the March 20, 1974 letter of Maurice McCrackin, a Cincinnati minister, to Barr, in which he stated that the teacher transfer proposal was an effort "to circumvent true integration" in Cincinnati." (Box 1, Folder 5, No. 35.)

**32.** Defendants mention this communication in their brief, but they make only a passing reference to this aspect of the letter. Doc. 79, at 13. This is rather odd in light of the clearly evident focus of the memo. Moreover, it is surprising in view of the fact that HEW's index to the administrative record states that the memo discusses "whether the Board resolution of 1–14–74 constitutes discrimination."

resolution. Moreover, he had told the review team that he did not believe Cincinnati was eligible for or should be granted ESAA funds. *Id.* Stromberg went on to note that,

The District is apparently subject to the imminence of legal action by the NAACP charging unconstitutional racial discrimination, and *it would seem likely that HEW may be made a co-defendant, if OCR determines the District eligible under the existing conditions* where the Open Enrollment Plan on which ESAA eligibility is based has had minimal effectiveness in reducing racial isolation and the current Board has resolved not to implement the plan calling for complete integration of students.

*Id.* (Emphasis in original.)

Stromberg characterized the January 14, 1974 resolution as "action which operated to delay, obstruct, and nullify steps lawfully taken for the purpose of protecting rights guaranteed by the 14th Amendment. . . ." *Id.* This conclusion was based, *inter alia,* upon Stromberg's reliance on the recitals in the December 10, 1973 resolution which set forth detailed "findings" about the segregated and unequal opportunities for minority students resulting from the Board's deliberate acts and omissions.

She also reported that "[t]he *Superintendent and his administrative staff are not taking any steps to implement the directives of the Brown-Temple Resolution of December 10, 1973,*" and emphasized that OCR had repeatedly requested such information. *Id.* at pp. 4–6. (Emphasis in original.)

Finally, Stromberg recommended that Cincinnati "should be advised that by virtue of its intentional segregative act it is ineligible for Title VII ESAA funding. Since the same fact constitutes a violation of Title VI, the Cincinnati School District should also be advised of its right to a hearing." *Id.* at 6.

41. On April 1, 1974 HEW's Office of the General Counsel wrote to Mines expressing their concurrence with the analysis contained in Stromberg's letter. Specifically, they said, "We concur in the reasoning and conclusions set forth in the March 25, 1974 draft memorandum proposed by Mr. Barr [33] pertaining to the ineligibility of Cincinnati for Title VII ESAA funding. . . ." (Box 1, Folder 4, Ex. 6.) The letter went on to state that they agreed "that Cincinnati is ineligible for ESAA funding unless the Board takes steps to implement the December 10, 1973 resolution." *Id.* at 2.

42. At the meeting scheduled for April 3, 1974 to discuss the Board's faculty balancing plan there was "considerable discussion" about the effect of the Board's January 14, 1974 action. (Box 1, Folder 5, No. 41.) Barr informed the Cincinnati officials that he had received a letter about this from the NAACP, "but that this would have no effect because the issue was a legal question to be decided by our OGC." *Id.*

43. Pursuant to James Jacobs' request at the close of the April 3 meeting, Kenneth Mines furnished a written status report regarding Cincinnati's eligibility for ESAA funding. (Box 1, Folder 5, No. 40.) Mines' five-page letter of April 5 summarized the substance of his staff's comments during the April 3 meeting, noting those "areas in which there remain serious problems." *Id.* With regard to faculty assignments, Mines indicated that the Board's March 18, 1974 action would result in five schools not meeting HEW's requirement of having the proportion of minority teachers at each school be between 75 percent and 125 percent of the overall proportion of minority teachers in the district.

Mines indicated that "the procedure used in assigning students to classes must be modified to prevent racially isolated or identifiable classes in the future." He also outlined the steps that the Board should follow to demonstrate that any nonpublic schools receiving property or services from

**33.** Although we do not have a copy of Barr's draft, it was undoubtedly the model for Stromberg's letter discussed above, and probably was identical in substance. *See supra* Finding 12 and Deposition of O.O. Barr.

Cincinnati were not operated in a discriminatory manner.

Finally, he noted that the "serious legal question concerning the affect [sic] of the Board's action on January 14, 1974" had been referred to their General Counsel. He promised to advise Waldrip "immediately upon receipt of the [OGC] determination" concerning Cincinnati's ESAA eligibility and possible Title VI violation.[34] Moreover, he added that "on the basis of the information furnished, there does not appear to be any action being taken to implement an alternative plan which would be equally effective in reducing the isolation or segregation of minority group students within your District's various schools."

44. During April 1974, Cincinnati officials continued to submit the materials necessary for achieving technical compliance. On April 9 and 18 Waldrip submitted material concerning the nondiscrimination policies of several nonpublic schools. (Box 1, Folder 5, Nos. 43, 47.) On April 23 Grate submitted the printed minutes from the Board's December 10, 1973 meeting. (Box 1, Folder 5, No. 51.)

45. On April 19, 1974 the Acting Chief of the Elementary and Secondary Education Branch sent Kenneth Mines a memo entitled "School Districts Found Eligible for Funding by Cleveland OCR." (Box 1, Folder 5, No. 48.) The memo said that Cincinnati was ineligible because of the new Board's actions impeding, delaying or obstructing the December 10, 1973 resolution "to completely desegregate all public schools."[35] Id.

46. On or about the same date, Barr drafted an eight-page letter of ineligibility to Cincinnati (Box 1, Folder 5, No. 49) which, with minor changes, was sent to Cincinnati on April 25, 1974. (Box 1, Folder 5, No. 52.) Thus, HEW did not notify the Board that they were ineligible for ESAA funding until three weeks after the OGC's April 1 determination that they were ineligible. See supra Finding 41.

47. The April 25 letter set forth the reasons for the ineligibility decision. (Box 1, Folder 5, No. 52.) First, the letter stated that the nonimplementation of the December resolution "constitutes discrimination against children" contrary to 45 C.F.R. § 185.43(d). Cincinnati was told they could seek a waiver which, in their case, "would require evidence that either the December 10, 1973 resolution is being implemented or that an alternative plan is being implemented that would be equally effective in reducing the isolation or segregation of minority group students within your District's various schools." Id. at 2.

The letter then went on to say that there were three other areas in which Cincinnati had failed to establish eligibility. With regard to teacher assignments, Cincinnati was found not to satisfy the requirements of regulation 185.43(c) as interpreted by HEW. Specifically, they found that "two schools would remain with a disproportionate minority group faculty as of September, 1974." Id. at 4. Despite the fact that the Board anticipated that this would be corrected by September 1975, HEW determined that the Board was not in compliance.

Third, although HEW expressed some concern about Cincinnati's method of student assignment, they indicated that "this area will not raise any question regarding eligibility" if HEW received Cincinnati's written confirmation that the improper assignments would be eliminated by Septem-

---

**34.** In fact the OGC had already made this determination as indicated by the four-page letter sent to Mines on April 1. Box 1, Folder 4, Ex. 6; see also supra. Finding 33.

**35.** This same document found Dayton to be ineligible and placed Detroit "in legal hold." In both cases OCR indicated these districts were determined not to have achieved eligibility at that point in time because OCR was still awaiting the submission of further material in the areas of student assignment, faculty, assignment, extra-curricular activities, etc. Interestingly, however, the memorandum did not indicate that OCR was awaiting other materials from Cincinnati. There was no mention whatsoever of technical noncompliance in the areas of student assignment, faculty assignment and transfers of property. Rather, Cincinnati's ineligibility was said to be based solely on the nonimplementation issue.

ber 1974.[36] *Id.* at 5. Finally, Cincinnati was declared ineligible for failing to provide adequate determinations of nondiscrimination regarding the nonpublic schools to which the Board provided services as required by state law. *Id.* at 6. The Board was also told how to establish eligibility in each of these areas by applying for a waiver.

48. In response to the ineligibility determination, the Board President wrote to Calais on May 2, objecting chiefly to HEW's finding of ineligibility regarding nonimplementation of the December resolution. (Box 1, Folder 5, No. 53.) The Office of Civil Rights was asked to respond to the Board's challenge to the civil rights ruling. (Box 1, Folder 5, No. 56.) Therefore, prior to May 16 Barr prepared a draft letter in response, but it was never sent. (Box 1, Folder 5, No. 61.) Barr's draft indicated that the conclusion regarding Cincinnati's ineligibility due to nonimplementation was "compelled by numerous decisions of the Supreme Court and other federal courts concerned with similar factual situations." *Id.* at 2. Moreover, the draft stated that the "efforts now underway" in Cincinnati were "not sufficient" because of failure to achieve compliance with the regulations concerning faculty assignments, student assignments, and transfers of property to nonpublic schools. *Id.*

49. The complaint in this case was filed May 14, 1974.

50. On May 29 the OCR did respond to the Board President's May 2 inquiry. This letter differed markedly in substance from the one drafted by Barr, which is summarized in Finding 40 above. The OCR merely acknowledged receipt of the letter and disagreed "with the allegations therein." In addition, OCR offered further assistance to Cincinnati in establishing ESAA eligibility.[37] (Box 1, Folder 5, No. 64.)

51. On May 29, 1974 the NAACP filed a class action suit against the Board and others seeking to enjoin the defendants from operating an unconstitutional, racially segregated school system. *Bronson v. Board of Education.* (Box 7, Folder 1, No. 1.). The complaint sought, *inter alia,* that the Board be required to implement the December 1973 desegregation plan and be restrained from effecting the January 1974 plan "insofar as its application would impair or delay the desegregation." *Id.* at 7–8. OCR officials were apparently in touch with individuals from Cincinnati's NAACP to obtain materials regarding the case. (Box 1, Folder 5, No. 68.)

52. On June 21, 1974 this Court granted plaintiffs' motion for a preliminary injunction in this case (doc. 4), ordering defendants to set aside $1,200,000, which was a portion of the funds the Board had sought (doc. 5). HEW was ordered "to take whatever steps may be necessary to make such funds available for the purposes set forth in the plaintiffs' application for a grant, including the reassignment, reallocation or the recall of any funds which may have been heretofore available to defendants to remit to plaintiffs." *Id.*

53. Cincinnati officials continued to try to establish their eligibility for funding. On June 27, 1974 Waldrip wrote to Barr because it had come to Waldrip's attention that he had not further responded "to that part of [the] letter dated April 25 in which [HEW] requested written confirmation of the verbal assurance given [the] review team on April 17, 1974...." (Box 1, Folder 5, No. 72.) Waldrip's letter went on to promise that by September 1974 "there would be no racially isolated or racially identifiable classes that are not educationally justified." He also submitted nondiscrimination determinations for the final

---

**36.** Ineligibility on this ground was based upon HEW's conclusion that "several hundreds" of students were assigned to racially identifiable or isolated classes for which no educational justification had been given. When later asked to identify those students or classes, they declined to do so. (Box 1, Folder 6, Nos. 38 and 44.) See also Finding 76.

**37.** This offer of assistance in establishing eligibility appears to have been disingenuous since it was sent *after* OCR had been informed that school districts cleared by OCR after May 24 had "virtually no chance of being funded" that year. (Box 1, Folder 5, No. 63.) *See also infra* Finding 61.

nonpublic schools receiving property or services from Cincinnati. *Id.*

Thus, by June 27, 1974 Cincinnati had corrected the deficiencies which OCR had cited regarding student assignments and provision of services to nonpublic schools. *See supra* Finding 47.

### (2). EVALUATION OF CINCINNATI'S PROPOSAL

The administrative record contains scant documentation regarding the Office of Education's programmatic review of Cincinnati's proposal because such documents were no longer in HEW files when the record was compiled in 1984. Nonetheless, it is possible to piece together a rather sketchy chronology of events.

54. On February 7, 1974 staff from OE's Chicago office, including Beverly Coleman, State Coordinator for Ohio, met John Grate and James Jacobs in Cincinnati for a "pre-grant review." According to Grate, at the meeting they were told "that our application set forth an excellent proposal" and that it had been "favorably approved at the Program Review Stage." 1974 Grate Affidavit at 2. Although they were informed that it would be necessary to revise some of the items, he stated that "[n]o suggestion was made at this time that consideration was being given to any reduction of the grant which had been requested." *Id.* at 3.

Coleman's account of the substance of the meeting is different. She contends that the Cincinnati officials were told that during the "administrative review of the budget" they would need to justify the "vast degree of remodeling as well as the large request for personnel and equipment in relationship to the number of pupils and schools to participate in the ESAA program." (Box 1, Folder 5, No. 44.)

55. On February 14, Grate sent the Office of Education some materials that had been requested during the site visit, and he promised to send additional material. (Box 1, Folder 5, No. 17A.)

56. On March 8, 1974 Coleman called Grate to inform him "of the administrative review of the application's requested budget." (Box 1, Folder 5, No. 44.) Coleman told Grate which line items in the budget were to be cut because they were found to be nonallowable, illegal or excessive in terms of the application's components. Cincinnati was told "to submit a revised budget reflecting the recommended amount." *Id.* According to Coleman, Grate indicated he would not do so. *Id.*

57. On March 11, Coleman and ESAA Program Manager Louis Irons spoke with Grate and James Jacobs on a conference call. *Id.* The Cincinnati officials told the OE personnel that "there was absolutely no way that the program objectives ... could be achieved with the level of resources and deployment" mandated by OE. (Box 1, Folder 5, No. 39.) Apparently both sides concluded the conversation with the impression that the other party would get back in touch with them concerning resolution of the disagreement. (Box 1, Folder 5, Nos. 39, 44 and 1974 Grate Affidavit at 3.)

58. Instead of revising the budget, Cincinnati's Superintendent of Schools wrote letters to enlist the support of Ohio Department of Education officials, as well as both United States Congressmen from Cincinnati and both Senators from Ohio. (1974 Grate Affidavit at 3.) On March 19, two Ohio Education officials wrote to HEW's Chicago office requesting full funding for Cincinnati's proposal. (Box 1, Folder 5, No. 32.) They noted the "severe limitations" this reduction would place "on the number of children to be served in the Cincinnati district." *Id.* Moreover, they stressed that "[a]t a time when major inroads on behalf of school desegregation are taking place in this district, the need for additional funds to carry out the board's commitment is urgent." *Id.* They also noted that they had spent much time assisting Cincinnati, which was the Ohio school district with the second largest number of minority students. *Id.*

Congressman Luken also contacted Coleman to determine the reasons for the reduction of funds. (Exhibit 3 to 1974 Grate Affidavit.)

59. Grate wrote to Coleman April 4, taking issue with OE's assessment that certain items in the ESAA proposal were not direct services to children, and were consequently excessive and nonallowable. (Box 1, Folder 5, No. 39.) Grate contended that the proposal, as designed, was a "well thought out and well prepared program" whose "aim in serving children was immediately clear to readers at all levels." *Id.* He set forth eight examples of "poorly thought out cuts" which he claimed were made "in an arbitrary manner with little attention to how these cuts would directly affect" services to children. *Id.* Finally, Grate expressed his disenchantment with ESAA and doubt about Cincinnati's participation "unless more thoughtful consideration is given to our proposal." *Id.* at 2.

60. Coleman's April 9 response set forth her account of the events that had transpired and informed Grate that the ESAA grants were "funded on a discretionary basis, not by entitlement." (Box 1, Folder 5, No. 44.) Coleman reminded Grate that during the March 11 conference call he had been asked to inform them when Cincinnati had decided "whether to accept or reject the recommended funding *level.*" *Id.* at 3 (emphasis in original). She noted that they still had not heard whether Cincinnati decided "to accept the recommended funding level with appropriate programmatic adjustments or not accept the recommended funding level declining to participate in ESAA." *Id.* Finally, she indicated her awareness of OCR's request for additional information concerning Cincinnati's civil rights eligibility, and cautioned that "this letter *only* refers to programmatic aspects of Cincinnati's proposal not to eligibility compliance aspects." *Id.*

61. Some ESAA grants were announced in April 1974. By early May, HEW began preparing to reallocate funds by transferring "uncommitted balances from the States where no fundable projects remain to other states where the initial apportionment was not sufficient to support all fundable projects." [38] (Box 1, Folder 5, No. 54.) The reallocation was scheduled to take place May 17. Districts were eligible to receive reallocated funds only if they were fundable in all respects, including OCR certification. On May 24, 1974 HEW indicated that any school districts cleared by OCR after that date stood "virtually no chance of being funded this fiscal year." (Box 1, Folder 5, No. 63.) On May 30 HEW completed the reallocation calculations which exhausted the 1974 state apportionment funds. (Box 1, Folder 5, No. 65.)

62. According to the uncontroverted affidavit of John Grate, Cincinnati Board officials were never told that these funds were no longer available.[39] Therefore, Cincinnati officials continued to submit materials in an attempt to qualify for ESAA funds. On June 20, Grate wrote to the Office of Education, (apparently in response to Coleman's April 9 letter)[40] requesting assistance in making the program adjustments required by OE's recommended funding level of $911,000. (Box 1, Folder 5, No. 70.) He specifically asked for an itemized budget statement of the approved projects. Grate also noted, "It is our hope that the Office of Civil Rights' decision on compliance can be resolved quickly so that we may get on with the implementation of the ESAA activity." *Id.*

63. The Office of Education responded on June 28 that because they considered Cincinnati to be ineligible for ESAA funds "it would appear inappropriate" for them "to take the time and effort required to provide the item-by-item budgetary statement which two months later you have requested." (Box 1, Folder 5, No. 73 at 1.) The letter went on to state that they would be glad to provide an itemized budget "[i]f the Federal District Court in Cincinnati

---

**38.** Ohio returned $3,234,887 for reallocation, an amount only slightly higher than Cincinnati's original request for $3,230,880. (Box 1, Folder 5, No. 69.)

**39.** Even if they had known, this Court's June 21, 1974 order required HEW to set aside funds for which the Board had applied, *even* if it meant reallocating funds already committed. *See supra* Finding 52.

**40.** *See supra* Finding 60.

were to decide, contrary to our view, that the School District is eligible for funding." *Id.* at 2.

64. Despite these disputes regarding the proper level of funding, it appears that Cincinnati's proposal was well received by the nonfederal panel that evaluated it. Although the evaluation is not part of the record, because it was no longer in HEW files when the administrative record was compiled, some handwritten notes from June 21, 1974 indicate that Cincinnati's ratings were well above the minimum necessary for funding. (Box 1, Folder 5, Nos. 69.) Cincinnati's composite score was 61.5, more than 16 points above the minimum of 45. On quality, Cincinnati scored 37.5, while the minimum was 28. On "need" the score was 24, significantly above the average 7–10. *Id.* Thus it appears that Cincinnati would have been funded if they had achieved OCR clearance.

### D. THE AFTERMATH OF THE INELIGIBILITY DECISION

65. On July 5, 1974 the Office of Civil Rights cited Cincinnati for violating Title VI of the Civil Rights Act of 1964 by virtue of its rescission of the December plan and failure to adopt any equally effective plan. (Box 1, Folder 6, No. 1.)

66. On July 12 HEW filed a motion to dismiss or, in the alternative, for summary judgment in this case (doc. 7). Consequently, when Superintendent Waldrip responded to the OCR's notification of Title VI proceedings, he suggested that administrative action against Cincinnati be deferred in view of the ESAA litigation in which it might be resolved. (Box 1, Folder 6, No. 2.)

67. During the summer of 1975, at the request of U.S. Representative Donald Clancy, the Board's attorneys attempted to negotiate a settlement in this action.

68. During late summer and early autumn, the Office of Civil Rights continued to gather information about Cincinnati's civil rights eligibility. In particular, Ortha Barr sought the assistance of Marian Spencer of the Cincinnati NAACP "to furnish any further details and documents regarding the past actions and inactions of the Cincinnati School System." (Box 1, Folder 6, No. 5; see also Nos. 6–10.) The purpose of this data gathering was to ascertain the factual basis for the examples of the Board's deliberate segregative acts which were enumerated in the Board's December 1973 integration resolution. (*See* Box 1, Folder 6, No. 6.) In addition, Barr secured additional information from Board member Robert Brown. (Box 1, Folder 6, Nos. 12, 14, 15 and 23.) Based upon this information, Barr prepared a fourteen-page summary of those facts that supported the Board's 1973 resolution. (Box 1, Folder 6, No. 17.)

69. In preparation for an October 11, 1974 visit to Cincinnati by Secretary of HEW Weinberger, the OCR prepared a memorandum summarizing both the NAACP suit and this suit. (Box 1, Folder 6, No. 11.) The memo said that "[t]he NAACP suit presents essentially the same issues that are present in the potential Title VI proceedings and in the Cincinnati Board's suit against HEW." [41] *Id.* at 3. Moreover, the memo's "suggested response" to questions about HEW's position on the NAACP suit was as follows: "In the event a decision is rendered in the NAACP case, under the provisions of the Title VI Regulations compliance with a final order creates a presumption of compliance with Title VI of the Civil Rights Act of 1964." *Id.*

70. On October 24, 1974 the Director of the Office of Civil Rights wrote to the Board President to clarify OCR's position about Cincinnati's ineligibility determination. (Box 1, Folder 6, No. 16.) The Director said that Cincinnati had been found ineligible under section 706(d)(1)(D) of ESAA, 20 U.S.C. § 1605(d)(1)(D).[42] It

---

41. In fact, it was anticipated that the two legal actions might be joined if HEW's motion for summary judgment in this case was not granted. (Box 1, Folder 6, No. 11 at 3.)

42. This section states that a school district is ineligible if it "had in effect any other practice, policy, or procedure ... which discriminates among children on the basis of race, color or

would not be necessary, however, for the Board to reinstate the December 10th plan in order to achieve eligibility. The Board could take alternative approaches which would be acceptable if they would "provide for the total dismantlement of the present discriminatory system."

The letter went on to say that the OCR had examined the rescission decision in the context of other Board actions which had been officially characterized as being racially discriminatory by the December 1973 Board resolution. Moreover, the OCR had confirmed this pattern of racially discriminatory actions through other information.[43] Cincinnati's "segregatory teacher assignment practices" were part of this pattern, and constituted an independent basis for ineligibility. For these reasons the Director concluded that the ineligibility determination had been correct, as was the determination of noncompliance with Title VI.

71. On November 13, 1974 Kenneth Mines responded to the Board President's July 30 letter indicating that he intended to refer Cincinnati's Title VI file to Washington for "appropriate legal action" unless Cincinnati agreed "to voluntarily undertake adequate corrective action." (Box 1, Folder 6, No. 20.) Consistent with the view expressed by the OCR Director, Mines noted that the Board need not reinstate the December plan as long as their alternate plan would dismantle the "present discriminatory system." *Id.*

Lacking any such response, Mines forwarded Cincinnati's file to Washington on December 10, 1974. (Box 1, Folder 6, No. 24.) The initiation of legal proceedings was deferred "until such time as the U.S. District Court in Cincinnati has reached a

decision in the pending suits involving" HEW. (Box 1, Folder 6, No. 27.)

72. On December 19, 1974 Waldrip sent Mines information on the implementation of the January 14, 1974 resolution. (Box 1, Folder 6, No. 26, and Box 5, Folder 4B.) This was supplemented on January 13, 1975 by a three-page letter from Jacobs and Grate. (Box 1, Folder 6, No. 28.)

73. OCR and Board officials continued to discuss the degree to which the Board had achieved any reduction in racial isolation pursuant to the January 14, 1974 resolution. In a fourteen-page letter of February 4, Mines concluded that "the information disclosed by the [OCR Civil Rights] Survey Forms does not indicate much progress, if any, toward the reduction or elimination of minority group isolation or segregation."[44] (Box 1, Folder 6, No. 30 at 14.)

On April 14 Waldrip responded to that conclusion by pointing out that "[m]any aspects of a program such as is set forth in the resolutions will be achieved only over a period of time." (Box 1, Folder 6, No. 35.) Nonetheless, some tangible progress had already been made. Waldrip sent Mines materials illustrating that progress, stating:

> In summary, the enclosed reports on alternative schools and open enrollment show that 860 pupils are attending racially balanced alternative school programs in 10 schools, and 547 pupils are attending schools selected voluntarily under open enrollment. All of the pupils in the open enrollment program are either improving the racial balance of the school

national origin." The corresponding regulation is 45 C.F.R. § 184.43(d).

**43.** Presumably this was the purpose of Barr's factual summary. *See supra* Finding 68.

**44.** This conclusion appears to have resulted in part from the fact that the change in the percent of minority enrollment at schools with alternative programs was calculated on the basis of those schools' overall racial composition rather than the racial composition of the alternative program classes themselves. It appears that the bilingual and college preparatory programs'

classes were racially balanced, but because only one or two classes of the alternative programs had been established at each school there was only a small alteration in the school's overall racial composition. Each year, with the addition of another alternative class, there would be further impact on the overall racial balance, ultimately culminating in a completely balanced school.

Moreover, OCR could have more accurately assessed the impact of open enrollment on reducing racial isolation if Cincinnati had identified the "sending schools" in addition to the "receiving schools."

attended or are attending a balanced school. In addition, nearly 6,000 high school students are attending Walnut Hills High School and three vocational centers at Aiken, Western Hills, and Withrow High Schools in student bodies that are in no sense racially isolated. The total number of pupils in these programs alone comprises about 11 percent of the system's enrollment; next year it is expected that this will be increased to approximately 20 percent under the programs described in enclosures.

Since it is not at all clear what criteria, if any, are required to be met in this field, and the application process could not be presumed to require any specific degree of success in advance of approval, it does not appear to us to be a very profitable approach to criticize efforts such as those described above or our staff assignment plan which has resulted in perhaps one of the most nearly balanced staffs in the nation.

*Id.*

74. Cincinnati did not apply for ESAA funds in 1975 because the "deadline dates established in the guidelines were simply too stringent" for them to meet. (Box 1, Folder 6, No. 36.)

75. This Court granted HEW's motion for summary judgment in this case on April 18, 1975.

### E. CINCINNATI'S 1976 ESAA APPLICATION

76. On June 16, 1975 Jacobs wrote to Stromberg indicating Cincinnati's interest in applying for ESAA funds in 1976–77. To ensure they were complying with ESAA regulations he requested specific information regarding "what constitutes a valid educational justification for the existence of racially isolated or racially identifiable classes." (Box 1, Folder 6, No. 38.) Among other things he requested a specific listing of the classes which HEW concluded were unjustifiably imbalanced" in HEW's 1973–74 survey of the Cincinnati schools.

Although a detailed draft of a response to Jacobs' letter was completed by June 26, 1975 (Box 1, Folder 6, No. 41), it was not actually sent until November 20, almost five months later. (Box 1, Folder 6, No. 44). That letter indicated that HEW was not able to provide a specific listing of the classes found to be imbalanced in 1973–74. This was, in part, because the "analyses of the building reports were curtailed when your district gave the review team a verbal assurance on April 17, 1974 that the procedure used in assigning students to classes would be modified." *Id.* at 2–3.

77. In December 1975, John Grate attended a meeting in Columbus, Ohio with Louis Irons, Beverly Coleman, and O.O. Barr, all of whom had been involved in reviewing Cincinnati's 1974 application. 1976 Grate Affidavit at 1. According to Grate, he was encouraged to apply for ESAA funds. In discussing Cincinnati's eligibility in light of the December 1973 and January 1974 resolutions, Grate contends that O.O. Barr

agreed with the assumption that this would be disposed of in the Bronson litigation and would render the school district eligible either by virtue of exonerating the district of any discriminatory action or result in a court ordered plan for desegregation. Mr. Barr did not indicate that any legal impediments stood in the way of our 1976 application.

*Id.* at 2.

78. On January 28, 1976, Grate, Waldrip, and Jacobs met with Irons and Coleman in Chicago. The agenda indicates that the meeting focused on programmatic aspects of Cincinnati's projects. 1976 Grate Affidavit, Exhibit 2.

79. On February 11, 1976, Barr wrote to Waldrip requesting basic data which would be needed if Cincinnati intended to apply for an ESAA grant in 1976. (Box 1, Folder 6, No. 46.)

80. On February 12, 1976, the Cincinnati School District submitted applications for two grants under the ESAA program, one for a basic grant and the other for a pilot grant.

81. As in 1974, processing was simultaneously conducted by two separate units within HEW: OCR began the civil rights

eligibility review; OE began a review of the educational merit of the application to ascertain the competitive ranking of Cincinnati for funding. We will summarize the chronology of the two reviews separately.

### (1) CINCINNATI'S ELIGIBILITY FOR FUNDING

82. On February 18, 1976, OCR completed Part I of an OCR "Clearance Form" indicating that Cincinnati was eligible within the meaning of 45 C.F.R. § 185.11 because they had a voluntary plan to reduce racial isolation in one or more schools.[45] (Box 1, Folder 6, No. 48.)

83. Part II of the OCR Clearance Form was completed on February 23, 1976 to determine Cincinnati's compliance with 45 C.F.R. §§ 185.41, 185.42, 185.43. (Box 1, Folder 6, No. 49.) The form indicated that Cincinnati "must apply for waiver" because of some noncompliance. It is unclear from the form what the basis for this conclusion was, but it appears that there was some doubt about Cincinnati's compliance with parts of sections 185.42, 185.43(c), and 185.-43(d)(5), due to apparent lack of information.[46]

84. On March 4, a proposed ineligibility letter was drafted. (Box 1, Folder 6, No. 51.) The letter indicated that Cincinnati was ineligible because it had had "discriminatory practices, policies or procedures in effect prior to the date of [their] current application." Id. at 6. This conclusion was based upon the fact that this Court had granted HEW's motion for summary judgment, thus "upholding" HEW's 1974 ineligibility determination regarding teacher assignments, student assignments, and transfers to nonpublic schools. Id. at 307. Moreover, HEW asserted that the nonimplementation of the December 1973 resolution remained a bar to eligibility even

though it had not been ruled on by this Court. Id. at 8.

85. On March 26 the proposed ineligibility letter was circulated by Barr to other HEW officials. (Box 1, Folder 6, No. 55.)

86. On March 31, 1976 the Sixth Circuit reversed and remanded this Court's order granting summary judgment to HEW in this case.

87. On June 3, 1976 Cincinnati was officially notified that it was ineligible for ESAA funding. (Box 1, Folder 6, No. 60.) The only significant change in the draft as finally sent was that it included reference to the Sixth Circuit's decision to remand this case. According to the letter, "Nothing in the opinion ... to remand that case on procedural grounds, indicates that the [HEW] determination was incorrect. Therefore, *unless the courts resolve this issue to the contrary*, the determination stands." Id. at 2, 3, 5 & 6 (emphasis added.)

88. When Cincinnati was notified of its civil rights ineligibility, it was told that it could have an informal "show cause" hearing and had the right to seek a waiver of ineligibility. (Box 1, Folder 6, No. 60.)

89. The show cause hearing was held on June 22, 1976 before Herman Goldberg, Assistant Commissioner of OE. There are no notes in the administrative record reflecting what occurred at the meeting, but John Grate's affidavit contains the following account of the meeting:

At this meeting Dr. Goldberg stated that HEW would not provide ESAA funds to the Cincinnati Public Schools until the district implemented the mandatory pupil assignment plan adopted on December 10, 1973. Dr. Goldberg further indicated that HEW has regarded the school district ineligible for ESAA funds since the

**45.** This is similar to the "turnaround" approval given to Cincinnati's proposal for 1974 funds. *See supra* Finding 26. Thus it appears that counsel for HEW was incorrect at the hearing when she said they did not receive such approval in 1976. See doc. 76, 89 at 10.

**46.** Unlike 1974, there was no correspondence with the Board about these deficiencies, nor was the Board given any opportunity to correct

them or to supply the necessary additional information. This suggests that the OCR investigation in 1976 was perfunctory at best because it relied almost exclusively on the theory that the 1974 determinations had been correct, and thus they barred Cincinnati from receiving funds in any subsequent year without seeking waivers.

time of the decision not to implement that plan. In view of this decision the presentation of data by the Cincinnati School District and discussion of the merit of OCR's allegations of ineligibility was entirely foreclosed.

1976 Grate Affidavit at 3.

Goldberg's account of this meeting indicates that Cincinnati's representatives "chose not to present additional information regarding any of the four reasons for ineligibility" but instead stated that they would file a supplementary complaint in this case. Affidavit of Herman Goldberg, attached to HEW's Motion for Reconsideration of Preliminary Injunction, doc. 44.

### (2) EVALUATION OF CINCINNATI'S PROPOSAL

90. The Office of Education's review panel completed and submitted technical review forms for Cincinnati's basic and pilot grant application on March 2-3, 1976. (Box 1, Folder 7, File 7B, Nos. 2A, 2B, 2C, 2D, 3A, 3B, 3C, 3D.) Three of the four panelists indicated that they would recommend funding the basic grant if specified necessary improvements were made. The scores of the individual panelists were below the required minimum,[47] however, so the review summary was marked "Resubmit."

91. For the pilot grant proposal, three reviewers favored approval, while the one other favored approval only if it were rewritten to address identified deficiencies. (Box 1, Folder 7, File 7B, Nos. 3A, 3B, 3C, 3D.) The scores received, however, were below the required minimum for funding,[48] and the project was consequently marked "Resubmit."

92. Six weeks later, on April 16, the Board was notified that both of its applications had been rated below the minimum scores required for funding. (Box 1, Folder 6, No. 56.) The letter of notification set forth in general terms the deficiencies, and invited the Board to modify its proposal and resubmit its application by May 7, 1976. *Id.* That letter went on to state:

> We would like to emphasize that the above comments relate solely to the quality of your ESAA Application and the activities proposed therein and are *not* to be taken as a judgment regarding eligibility for ESAA funds. Considerations of administrative efficiency sometimes dictate that the quality of an application be reviewed before eligibility to receive ESAA funds is established.

*Id.* at p. 2.

93. With technical assistance from HEW, the Board revised its application and resubmitted it on May 7, 1976. (Box 1, Folder 3.)

94. The resubmitted applications were reviewed by a panel that had three of the original four panelists. (Box 1, Folder 6, No. 63.) The revised basic grant received scores similar to the first ones despite the fact that the Board had attempted to make changes as recommended. The scores of 25, 29, 27 and 23 averaged 26, still below the minimum of 28, and it was therefore marked "Low Quality" on May 12, 1976. (Box 1, Folder 7, File 7B, No. 11.)

95. Three of the four panelists recommended funding of the resubmitted pilot program, but noted some reservations about specific components of it. The proposal received scores of 28, 39, 31 and 29,

---

**47.** There is some discrepancy in the rating figures reported. The Educational Quality Rating Panel Review Summary indicated scores of 33, 25, 25 and 22 for an average of 26.25. (Box 1, Folder 7, File 7B, No. 4.) The scores reported on the reviewers' Technical Review Forms indicated scores of 31, 22, 20 and 22 which would result in an average of 23.75. (Box 1, Folder 7, File FB, Nos. 2A, 2B, 2C, 2D.) In either case, however, the scores were below the minimum required score of 28. 40 Fed. Reg. 20660-1, May 12, 1975. (Box 1, Folder 7, File 7A, No. 3.) We will utilize the scores from the Summary

Form as they are the ones HEW appears to have relied upon.

**48.** In the pilot grant review material there are also discrepancies in the scores. On the reviewers' forms the final scores, out of a maximum of 53, are 41, 25, 29 and 23. (Box 1, Folder 7, File 7A, Nos. 3A, 3B, 3C, 3D.) These scores would result in an average of 29.5. The summary sheet reports that the scores were 41, 28, 33 and 27 for an average of 32.25, just barely below the minimum of 33. 40 Fed.Reg. 20660, May 12, 1975.

for an average of 31.75, which was below the minimum of 33. It was marked "Low Quality." (Box 1, Folder 7, File 7B, No. 12.)

96. The following chart summarizes the ratings given Cincinnati's basic and pilot grant proposals during their initial and resubmit reviews.

RATINGS OF CINCINNATI'S 1976 ESAA PROPOSAL

| Reviewer | BASIC GRANT | | PILOT GRANT | |
|---|---|---|---|---|
| | Initial | Resubmit | Initial | Resubmit |
| A | 33* | 29* | 41* | 39* |
| B | 25** | 25 | 28** | 28* |
| C | 22** | 23 | 33* | 29 |
| D | 25 | — | 27* | — |
| E | — | 27 | — | 31* |
| Total | 105 | 104 | 129 | 127 |
| Average | 26.25 | 26.00 | 32.25 | 31.75 |

\* Recommended federal support
\** Recommended support only if resubmitted and rewritten

97. The reviewers' comments on their review sheets indicate that they were aware of and considered factors which were not among those set out in the regulations. For example, one reviewer said, "If the former Superintendent were placed in charge of this project with 'no strings attached' this panelist would feel safe in the recommendation." Another stated, "There are too many problems with this proposal. Funding should clearly not occur unless these problems as well as the local problems of the district are resolved." Finally, another reviewer wrote, "The proposal has the distinction of being the only one that made me angry enough to spit! The area of human relations is not going to help much if the writer only recognizes 2 races." [49]

98. At the conclusion of the civil rights show cause conference discussed in Finding 89 above, the hearing officer informally advised the Cincinnati officials that their revised applications did not meet HEW's minimum scores. *Id.* and doc. 79 at 34.

99. On June 24, 1974 plaintiffs filed a supplemental complaint and motion for preliminary injunction in this case (docs. 41,

42). On that same day this Court ordered HEW to create and obligate a fund of $1,884,401 (doc. 43).

100. On June 25, 1976 the Board received formal notification that it would not receive ESAA funding because its second application lacked educational merit. (Box 1, Folder 6, No. 61.) The letter set forth no specific reasons for this conclusion, noting only that the applications had not achieved the minimum scores required.

IV. CONCLUSIONS OF LAW

In 1975, when this Court considered the validity of HEW's 1974 determination of ineligibility, our inquiry was "bounded by the procedural confines of cross-motions for summary judgment." 396 F.Supp. at 226. We examined each of HEW's asserted grounds for ineligibility because it was "apparent" to us that if any one of HEW's determinations was correct, HEW was entitled to summary judgment as a matter of law. *Id.*

Our inquiry now is much different and much broader because we are no longer bound by the strict limits of a summary

**49.** In fact the school population in Cincinnati was composed almost exclusively of only two races. At the time there were only 295 pupils of other racial groups out of a total of 68,546 students in the Cincinnati schools. 1976 Grate Affidavit at 4.

judgment motion. Instead, as we have already discussed in Part II of this Opinion, we are now deciding this case on the merits and on a greatly expanded record, seeking to determine whether the facts set forth above show that HEW's decisions denying ESAA funding to the Board were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

We have catalogued the events surrounding these decisions with care to enable us to make the "searching and careful" examination which is necessary. We are now able to determine not only what facts were considered by HEW, but also how those facts were construed. Under the standards for review contained in the Administrative Procedure Act, 38 U.S.C. § 706, this Court finds that HEW's decisions denying ESAA funding to Cincinnati in 1974 and 1976 must be set aside for the reasons set forth below.

### A. HEW'S INELIGIBILITY DETERMINATIONS WERE CONTRARY TO LAW

HEW found that the Board's failure to implement the December 10, 1973 resolution made the Cincinnati School District ineligible to receive ESAA funding because it constituted other discrimination against children within the meaning of 20 U.S.C. § 1605(d)(1)(D), as defined in 45 C.F.R. § 185.43(d). This is demonstrated by the April 25, 1974 ineligibility letter as well as by Stromberg's March 29, 1974 "action memorandum" to Mines (Finding 40 *supra*), and the Office the General Counsel's April 1 letter concurring with Stromberg's analysis. (Finding 33.) The OGC's April 1 letter is particularly revealing in that it acknowledged that Cincinnati "appears to meet the basic eligibility requirements set forth at 45 C.F.R. § 185.11(b)." Therefore "the specific question" remaining was whether the January 14, 1974 resolution not to implement the December 10, 1973

plan resulted in discrimination under § 185.43(d).

To answer that question, HEW examined contemporary judicial decisions involving instances in which state legislatures or school boards had rescinded previously enacted integration plans. In particular, they relied on a line of cases following *Bradley v. Milliken*, 433 F.2d 897 (6th Cir.1970).[50] In *Bradley*, the Sixth Circuit held that a Michigan statute which suspended the Detroit Board of Education's integration plan was unconstitutional because it violated the fourteenth amendment. *Id.* at 904. In reaching this conclusion, the Court distinguished *Deal*, saying:

> In *Deal* this Court held that the school board of a long-established unitary nonracial school system had no constitutional obligation to bus white and Negro children away from districts of their residences in order that racial complexion be balanced in each of the many public schools in the City. In the present case the Detroit Board of Education in the exercise of its discretion took affirmative steps on its own initiative to effect an improved racial balance in twelve senior high schools. This action was thwarted, or at least delayed, by an act of the State Legislature. No comparable situation was presented in *Deal*.

*Id.*

Based on the line of cases following *Bradley*, HEW concluded that "there is no question" that "an action by a newly elected school board delaying, impeding, or frustrating the lawful implementation of a discrimination plan is an act which results in discrimination against children on the basis of race which not only violates the Equal Protection Clause of the Fourteenth Amendment, but also violates 45 C.F.R. § 185.43(d)." (Box 1, Folder 4, No. Exhibit 6.) Since HEW found that the January nonimplementing resolution delayed or impeded implementation of the December

---

**50.** The other cases included *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766 (W.D.Mich. 1971), *aff'd* 448 F.2d 635 (6th Cir.1971); *Martin v. Evansville-Vanderburgh School Corp.,* *Indiana*, 347 F.Supp. 816 (S.D.Ind., 1972); *Brinkman v. Gilligan*, Civil No. 72–137 (S.D. Ohio 1973).

plan, Cincinnati was found to be ineligible under § 185.43(d).

■ We now know, however, that HEW was incorrect in concluding that rescission of a school board's integration plan necessarily constitutes unconstitutional discrimination. In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court agreed with the Sixth Circuit's statement in *Brinkman v. Gilligan*, 503 F.2d 684, 697 (1974) which was as follows:

> The question of whether a rescission of previous Board action is in and of itself a violation of appellants' constitutional rights is inextricably bound up with the question of whether the Board was under a constitutional duty to take the action which it initially took. *If the Board was not under such a duty, then the rescission of the intial action in and of itself cannot be a constitutional violation.* If the Board was under such a duty, then the rescission becomes a part of the cumulative violation, and it is not necessary to ascertain whether the rescission *ipso facto* is an independent violation of the Constitution.

433 U.S. at 414, 97 S.Ct. at 2772 (emphasis added; citations omitted). Thus, the non-implementation of a previously passed de-segregation plan does not constitute a segregative act unless there was a preexisting constitutional duty to implement the plan.

■ The facts adduced above indicate that HEW made no attempt to ascertain whether, in fact, the Board was under a constitutional duty to implement the December plan.[51] Moreover, our examination of the administrative record leads us to conclude that Cincinnati had no constitutional obligation to implement that particular plan. This conclusion is dictated in part by the *Deal* holding that the Cincinnati School Board had no constitutional duty to correct the racial imbalance in their school system because that imbalance had not been caused by the Board. *Deal I*, 369 F.2d at 61, 63–65. Admittedly, the vitality of the *Deal* holding was in question at the time HEW made the 1974 ineligibility decision, and it continued to be questioned long after.[52] Nonetheless, it is now clear that *Deal* was not dead then,[53] and that its holding continues to be res judicata to this day. *Bronson v. Board of Education*, 687 F.2d 836, 843 (6th Cir.1982)

The fact that *Deal* was found to preclude relitigation of the Board's conduct prior to July 1965 significantly limited the plaintiffs' likelihood of success on the merits in *Bronson*.[54] Likewise, it limits us in this

---

**51.** In fact, to the extent that HEW did make any independent factual inquiry about this, it was long after the ineligibility decision had been made. See Findings 68, 70 *supra.*

**52.** The vitality of the *Deal* decision was the subject of litigation throughout the eight years of the *Bronson* case. In 1975 this Court entered an order in *Bronson* determining the extent to which the defense of res judicata could be raised with regard to the issue of the Board's segregative intent, which had already been litigated in *Deal*. *Bronson*, Document 56. On interlocutory appeal, the Sixth Circuit affirmed that order as modified by them, holding that the *Bronson* plaintiffs were collaterally estopped from raising the Board's conduct prior to July 26, 1965 as a basis for a desegregation order. *Bronson*, 525 F.2d 344, 349, [*Bronson I*].

Nonetheless, following the Sixth Circuit's decision there continued to be discussion about *Deal's* vitality. See, 510 F.Supp. 1251 for some evidence of this. As a result of this continuing speculation, in 1982 Judge Rice determined that the Sixth Circuit's *Bronson* decision had "been rendered obsolete to the extent that it forecloses any and all inquiries prior to July 26, 1965." 535 F.Supp. 846, 907. This was because "the body of desegregation law" had been supplemented, making it appropriate to consider issues that had not been addressed in *Deal*. Thus, Judge Rice concluded that the *Bronson* plaintiffs were "entitled to proceed on the pre-July 26, 1965 issues ... which do not share the requisite element of identity with those actually litigated and determined in *Deal*." *Id.*

On interlocutory appeal, the Sixth Circuit strongly disagreed, and reiterated their earlier holding, stating it was "still the controlling law of this case and must be applied by the district court." *Bronson II*, 687 F.2d at 843. Thus, the *Bronson* plaintiffs were not permitted to "reopen the issue of whether the Cincinnati school system was unlawfully segregated prior to July 26, 1965." *Id.*

**53.** Despite statements by some, including this Court, to the contrary.

**54.** In addition to the difficulties presented to the *Bronson* plaintiffs by *Deal*, they were also faced with another roadblock, *Bell v. Board of Edu-*

case. We may only conclude that Cincinnati had a constitutional duty to implement the December 10, 1973 resolution if we find that, subsequent to July 26, 1965, the Board engaged in a course of conduct that caused it to incur the obligation to eradicate racial imbalance in the Cincinnati public schools. In other words, we must find that, subsequent to July 26, 1965, the Board engaged in segregative acts which the December 10, 1973 resolution sought to correct.

■ Our review of Board policy from 1965 to 1973 as reflected in the administrative record before us discloses no such acts.[55] Although it cannot be said that the Board was making significant progress in reducing the segregation in its school system during this period, there is ample evidence of the Board's resolve to undertake programs aimed at achieving desegregation. (Findings 2–9.) While these measures did not produce the dramatic changes that would have resulted from implementation of a program such as that embodied in the December 1973 resolution, they were nonetheless programs aimed at achieving integration, which eventually bore fruit. Moreover, we do not find that the lack of such far-reaching programs, or any other acts of the Board during this period, rise to the level of being acts of *de jure* segrega-

tion which imposed a constitutional duty on the Board to implement the December resolution.

■ Based on the record before us, therefore, we find that the Board was not under a duty to eliminate racial imbalance when it adopted the December resolution; we also conclude that it had no constitutional duty to implement that resolution once it was passed. The Board's failure to implement the December resolution was therefore not a violation of the Constitution. To the extent that HEW relied on this rationale in rejecting the Board's applications for ESAA funding, we now hold that its determinations were erroneous as a matter of law.[56]

■ Moreover, we agree with plaintiffs that HEW's actions were contrary to law because they violated one section of ESAA. Specifically, we conclude that HEW violated 20 U.S.C. § 1651 which prohibited ESAA from being construed as requiring "the assignment or transportation of students or teachers in order to overcome racial imbalance." The facts recited above, particularly (Findings 34, 41, 43, 47, 70, 71, and 89), clearly illustrate that HEW decided to withhold ESAA funds from Cincinnati unless the Board agreed to implement the Decem-

---

*cation,* 683 F.2d 963 (6th Cir.1982). *Bell* was found by this Court to preclude the *Bronson* plaintiffs "from attempting to prove that *other parties* and/or agencies not before the Court acted with segregative interest ... in creating a *de jure* segregated community and/or school system in Cincinnati." *Bronson,* 573 F.Supp. 767, 774 (S.D.Ohio 1983). Due to the combination of these two roadblocks this Court concluded that the *Bronson* plaintiffs "faced significant risks which may have prevented their ultimately prevailing" if that case had gone to trial. *Bronson,* 604 F.Supp. at 75.

**55.** This is not a judicial holding exonerating the Board's actions during the post–1965 period as *Deal* did with regard to the pre–1965 period. In *Bronson* the claims of the plaintiffs about post–1965 Board actions were dismissed with prejudice after a fairness hearing on the proposed settlement in that case. *Bronson,* 604 F.Supp. 68, 82 (S.D.Ohio 1984).

**56.** We recognize that ESAA may require a stricter standard than this constitutional standard. *Board of Education, New York City v. Harris,*

444 U.S. 130, 149–50, 100 S.Ct. 363, 374–75, 62 L.Ed.2d 275 (1979). The Supreme Court has found that "[t]he ineligibility provisions of § 706(d) [of ESAA] ... contain additional requirements, and there is no indication that mere compliance with Title VI [of the Civil Rights Act of 1964] satisfies them. *Id.* In examining whether these additional requirements are met, thus establishing eligibility, the Supreme Court has decided that the proper standard is "discriminatory impact." *Id* at 151, 100 S.Ct. at 375. The impact standard has not been applied to our analysis, however, because it was never even an implied basis for HEW's decision. HEW asserted that Cincinnati was ineligible because of rescission of the December plan which was a constitutional violation. Moreover, the administrative record is manifestly inadequate to have allowed HEW or this Court to make such a determination. HEW conducted no independent fact-finding on this issue and made their determination solely on the basis of their legal analysis. That it was considered purely a legal question is illustrated at several points in the record. See Findings 34, 40, 41, 42, 43, 48, 77.

ber resolution by requiring mandatory busing. Although several of the documents in the record say that it was not necessary for the Board to bus in order to remove this basis for ineligibility, the Board was told that it must implement some "equally effective" plan (Finding 47), or that they must "provide for the total dismantlement of the present discriminatory system." (Finding 70; see also Finding 71.) To tell the Board they need not bus to become eligible is thus disingenuous in light of the impossibility of devising any equally effective plan without mandatory busing. We find that HEW thus conditioned the receipt of ESAA funding on the implementation of some form of busing, which was contrary to law. HEW's determinations are therefore unsupportable as a matter of law for an additional reason.

### B. HEW'S INELIGIBILITY DETERMINATIONS WERE ARBITRARY, CAPRICIOUS OR OTHERWISE AN ABUSE OF DISCRETION

HEW contends that there were three other grounds on which it based its ineligibility decision, any one of which would support its determination. We disagree. Our findings of fact lead us inescapably to the conclusion that the sole reason for HEW's determination that the Board was ineligible for ESAA funding was the Board's failure to implement the December resolution. There can be no doubt on this record that if Cincinnati had abandoned neighborhood schools and bused to achieve racial balance that its ESAA application would have sailed through with flying colors. The other three bases for denying Cincinnati's eligibility were mere "window dressing," without substantial basis. As such, HEW's reliance on them as grounds for ineligibility was arbitrary, capricious or otherwise an abuse of discretion. To demonstrate the factual basis for our conclusion, we will show that HEW's only concern was the implementation of the busing resolution, and that the other three proffered reasons for finding Cincinnati ineligible were unsupportable afterthoughts.

The facts chronicled above make it apparent that HEW would have found Cincinnati ineligible even if they had found the Board to be in technical compliance on the other three factors cited in their April 25, 1974 letter. The documents generated within HEW and their correspondence with the Board and others during the entire period reviewed above reveals that the nonimplementation issue was of paramount importance, absolutely overshadowing all other aspects of the eligibility determination.

Immediately after the Board's adoption of the January 1974 plan as a replacement for the December plan, HEW began its single-minded focus on nonimplementation. Findings 30 through 48 detail these events. The evidence of this preoccupation is abundant and includes HEW's January 18, 1974 letter saying that it was "quite urgent" that they receive information about implementing the December resolution, the February 1 letter indicating the "absolute necessity" of receiving the information in order to conduct any further review, the March 7 meeting during which Cincinnati officials were told to keep HEW "fully informed regarding any and all steps taken to implement any desegregation plan," the internal March 13 letter asserting that the "turnaround" approval of Cincinnati's plan was based on the December plan, the March 29 memorandum finding Cincinnati ineligible exclusively for nonimplementation, the April 1 letter concurring with that opinion, the April 19 memo finding Cincinnati ineligible solely because of nonimplementation, and the April 25 letter of ineligibility itself which gave prominence to this basis for ineligibility. Nonimplementation also continued to be a central theme of HEW throughout 1975 and 1976. (See Findings 70, 71 and 89).

Moreover, beginning on January 11, 1974 nonimplementation was the subject of considerable discussion between HEW officials and persons not connected with either HEW or the Board. HEW was in close contact with Cincinnati NAACP officials throughout this period, soliciting their opinions and information about their intention of filing suit against the Board. (See Findings 30, 33, 36, 40.) Moreover, on March 14, 1974 HEW also went so far as to in-

form one person who had no connection with the School Board that Cincinnati would not be eligible for ESAA funding if the Board rescinded the December plan. (Finding 34 and accompanying footnote.)

■ Although HEW officials assured the Board that their contacts with the NAACP would not affect their eligibility determination (Finding 42), this was clearly not the case. Internal HEW documents make it clear that a chief reason for HEW's preoccupation with nonimplementation was their fear of being named as a codefendant in the desegregation case that they knew the NAACP intended to file. From their earliest contacts with the NAACP, this was an apparent concern. (See Finding 30.) This continued to be a key preoccupation, as indicated by the March 29 HEW memo that focused on the NAACP's position. (Finding 40; see also note accompanying Finding 33.) Thus it becomes clear that the ineligibility decision was also designed to prevent HEW from being named as a codefendant in the imminent desegregation litigation. While this motivation was understandable, it was also improper, casting further doubt on the defensibility of the ineligibility determination.

For all these reasons, we are certain that the nonimplementation of the December 1973 plan was the real reason for HEW's decision to declare the Board ineligible for ESAA funding. Moreover, it is apparent that HEW was so convinced that nonimplementation would preclude the Board's eligibility, that their review of other aspects of the Board's eligibility was curtailed. The record shows that HEW denied the Board the same opportunity to achieve eligibility as it gave to other districts. The most telling evidence of this is the April 19, 1974 memo finding Cincinnati ineligible due to nonimplementation, but deferring an eligibility decision on two other districts pending receipt of further materials to establish their eligibility. (Finding 45.) HEW has in fact acknowledged this with respect to their analysis of racially identifiable classes which was stopped after they received verbal assurances that the method of assign-

ing students to classes would be modified. (Finding 76.)

Finally, it is clear that nonimplementation was in fact the sole ground for denial of eligibility because HEW's conclusions of ineligibility on the other grounds were incorrect. Admittedly we held otherwise in our 1975 decision to grant summary judgment to HEW on each of these grounds. 396 F.Supp. at 230–42. The Sixth Circuit determined, however, that we were wrong in our decision because they found that there were disputed material facts regarding each of these grounds. 532 F.2d at 1071. On reexamination, especially in the context of the overall eligibility determination, we now find that HEW's decision to declare the Board ineligible on these remaining grounds was incorrect.

First, with regard to the issue of student assignments, it is now clear that Cincinnati had in fact achieved eligibility as early as April 17, 1974 when they promised to use a different method to assign students to classes. HEW curtailed its investigation on the basis of these assurances, thereby suggesting that they were satisfied on this ground. Moreover, even the letter of ineligibility acknowledges this, stating, "assuming that such written confirmation is received, this area will not raise any question regarding eligibility." (Finding 47.) Cincinnati did send the necessary written assurances on June 27, 1974. (Finding 53.)

Second, concerning the nondiscrimination determinations for nonpublic schools receiving services, we find that the Board also was ultimately in compliance when they supplied the requested information on June 27. (Finding 53.) Although they were admittedly tardy in completing the required information, we attribute that to the Board's preoccupation with the nonimplementation issue and this case.

■ Finally concerning teacher assignments, we find that the minor degree of deviation from HEW's preferred racial balance quotas did not constitute the disparate impact in teacher assignments found necessary by the Supreme Court to justify a finding of ineligibility. *Board of Education, New York City v. Harris*, 444 U.S.

130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979). In *Harris* the Court indicated that the key consideration was whether a teacher assignment policy had discriminatory impact. That is, this ineligibility rule "focuses on actualities, not on history, on consequences, not on intent." *Id.* at 146–47, 100 S.Ct. at 373. The Court specifically stated that ESAA "does not require faculties to be in perfect racial balance. It prohibits only faculty assignments that make schools racially identifiable. That is a much narrower requirement." *Id.* at 148, 100 S.Ct. at 373. Thus, ESAA's requirement that a district is ineligible if it "engaged in discrimination based on race … in the … assignment of employees" means that the district must have had a policy that had a discriminatory impact.

We found that the record clearly establishes that Cincinnati actually had in effect a policy specifically designed at ensuring that the racial makeup of the faculty at each school would approximate that of the district as a whole. (Finding 39.) In fact, the faculty was already so well balanced racially that there were only ten out of 110 schools to which the requirement of 45 C.F.R. § 185.43(b)(2) applied. The record is also clear that the modification of the faculty balancing plan in March 1974 was dictated by legitimate educational and societal concerns, and would have resulted in only a modest delay in achieving complete racial balance. As a result of this change, only five out of 110 schools would have had faculties that were outside of the racial balance targets established by HEW. Moreover, even HEW acknowledged that in two of these cases "the situation was not so serious." (Box 1, Folder 5, No. 40.) In light of the overall context of Cincinnati's staff balance, we find that HEW did not make a prima facie showing of discriminatory impact such as is necessary under *Harris*.

Moreover, even if HEW were found to have made an adequate statistical showing of discrimination, the Supreme Court has said that the disparate-impact test is rebuttable. 444 U.S. at 151, 100 S.Ct. at 375. Therefore, Cincinnati may have had a burden of rebutting the statistical evidence.

Their failure to do so is not fatal in this case, however, because they were never given the opportunity to do so. Instead they were instructed to apply for a waiver, a process that would have been an admission that HEW was correct in finding them ineligible, and which would, in any event have been ineffective in removing the real roadblock to eligibility—the nonimplementation barrier.

For all of these reasons, we conclude that HEW's finding that the Board was ineligible for ESAA funding in 1974 was arbitrary, capricious, or an abuse of discretion and must be set aside.

HEW's 1976 ineligibility decision must likewise be set aside. This is apparent for two reasons. First, the 1976 decision relied exclusively on the correctness of the 1974 decision which we have now found to be improper. Second, after encouraging Cincinnati to apply in 1976, HEW failed to conduct any new review of Cincinnati's civil rights eligibility. Instead, they relied on their 1974 findings, some of which had been partially updated in 1976. Consequently, the administrative record is insufficient to support HEW's contention that by 1976 the Board had not cured the civil rights deficiencies that led to its ineligibility in 1974.

We also find that the Board is correct that it would have been a futile act to seek a waiver of civil rights ineligibilities in 1976 because of HEW's position on the nonimplementation issue. Moreover, the 1976 letter of ineligibility was unequivocal in stating with regard to *each* ground for ineligibility that HEW intended to stick with their 1974 determinations "unless the courts resolve this issue to the contrary." Finding 81. Thus, it was not "mere speculation" on the part of the Board that it would be fruitless to apply for a waiver.

## C. HEW'S EVALUATION OF CINCINNATI'S 1976 PROPOSAL WAS ARBITRARY, CAPRICIOUS OR AN ABUSE OF DISCRETION

HEW contends that even if we find that their ineligibility decisions were

wrong, that their 1976 decision not to fund Cincinnati was nonetheless appropriate because Cincinnati failed to meet their educational criteria. They remind us that if the Assistant Secretary determines that a particular proposal is of such insufficient promise for achieving the purpose of ESAA, its funding is not required. 20 U.S.C. § 1604(b)(3). To determine the educational merit of proposals, HEW promulgated and followed uniform regulations in reviewing and rating the proposals. *See* 45 C.F.R. Part 1985 and the Supplementary Program Activities Manual (Box 1, Folder 7, File 7A, No. 1, and Findings 12.)

According to HEW, the educational review of each application was independent of the civil rights review, and there is "no evidence whatsoever that the activities concerning the civil rights review influenced in any way the educational review." Document 79 at 36. We disagree. Some of the comments of the people on the educational review panel reveal that factors other than those set forth in the regulations were considered. (Finding 97.) Moreover, since some of the reviewers were from Ohio, it is likely that they knew much about the civil rights issues involving Cincinnati, including the NAACP suit against the Board. While we found only one explicit comment on a reviewer's sheet concerning these "local problems," we find it hard to believe that such factors did not play a role in the evaluations of Cincinnati's proposal. Given how close Cincinnati was to achieving scores above the minimum required scores, we think it is likely that such reviewer bias may well have been responsible for the critical difference.

We also question the reliability of the evaluations given Cincinnati's 1976 proposals because they are significantly lower than those received in 1974. According to a handwritten summary comparing the 1974 and the 1976 proposals, they were apparently quite similar in content. (Box 1, Folder 6, No. 64.) Nonetheless, in 1976 Cincinnati's programs were found to be lacking in educational merit. Moreover, we

find it difficult to give much credence to the evaluations of the panel that reviewed Cincinnati's revised proposal because they differed so little from the scores on the initial proposal despite the technical assistance in redrafting that Cincinnati had received from HEW and the Ohio Department of Education.

The educational review is also suspect because of the evidence in the record that Office of Education officials were aware of the progress of the Office of Civil Rights' review. (Findings 34, 37, 60, and 67.)[57] Although the two processes may well have been independent in theory, at least in Cincinnati's case we find that they were intertwined.

Finally, we are troubled by OE's solicitation of a revised proposal from Cincinnati at a time when the decision to declare them ineligible on civil rights grounds had already been made.

For all of these reasons, especially when taken together in the context of the prior eligibility determination, we find that the educational review panel's conclusion that Cincinnati's proposal lacked educational merit reflected significant bias and lack of good faith, making it arbitrary, capricious, or an abuse of discretion, which must be set aside.

## V. CONCLUSION

We have set forth above, in painstaking detail, the entire chronology of events surrounding Cincinnati's efforts to obtain ESAA funds. We have written at length in part because of our hope that this may turn out to be the concluding chapter in the twenty-three years of desegregation litigation involving Cincinnati. We say this, not because we have found that Cincinnati has achieved complete school desegregation, but rather because we hope that the goals set out in the *Bronson* settlement will in fact be met, making further legal action unnecessary.

---

**57.** While several of these relate to review of the 1974 application, they are still indicative of the lack of separation between the two processes, particularly since the same people reviewed Cincinnati's application each time.

Our analysis of this case reflects the new perspective which we have by virtue of reviewing it in 1986, a dozen years after its origin. Our new outlook was made possible in part by the different record for review, one which was greatly expanded both in scope and in length. This greater breadth allowed us to appreciate fully the overall historical context in which this case originated, and its intimate relationship with the *Bronson* case and the politics of the time.

As a result, we now recognize that when we first considered HEW's denial of ESAA eligibility, we may have "missed the forest for the trees." That is, instead of addressing the key issue, the constitutionality of Cincinnati's nonimplementation of the December 1973 resolution, we decided the motion for summary judgment on narrow technical grounds concerning Cincinnati's compliance with specific ESAA regulations. We still believe that this was a reasonable approach to the question at that time, when it was expected that the constitutional issue would be settled in *Bronson*. But now we have found that these technical factors were not the genuine reason for rejection of Cincinnati's ESAA application, and we have treated them accordingly.

Our new perspective has also resulted from the fact that we followed the Sixth Circuit's instruction to delay final resolution of this case until the conclusion of *Bronson*. Although this resulted in an unfortunate and lengthy delay, it gave us the luxury of hindsight. We now know that the *Bronson* claims were dismissed with prejudice following settlement and an exhaustive fairness hearing. We interpret the Sixth Circuit's instruction to await the resolution of *Bronson* as indicative of their conviction that this case should be resolved in a manner consistent with the *Bronson* settlement. As we understand it, that settlement stands for a commitment by both plaintiffs and defendants to pursue desegregation in Cincinnati, not through mandatory busing, but rather through voluntary desegregation induced by excellent magnet schools as true alternatives to, but not replacements for, neighborhood schools.

We recognize that Cincinnati's approach to desegregation may well have originated more as a means to avoid busing than as an expression of commitment to complete desegregation. Somewhere along the line, however, the Board became not only committed to the course it was following, but also enthusiastic about it. The record of success of affirmative and magnet schools shows the Board's genuine commitment to this means of desegregation, and the public's support of it.[58]

We also acknowledge the justifiable impatience of those who opposed this approach in the early 1970s. These people were frustrated by the lack of desegregation progress during the eight years of *Deal* litigation, and the Board's ultimate vindication therein. It is not surprising that these people felt the need for more drastic measures to achieve a rapid reduction in the school segregation which admittedly existed at that time.

Ironically, however, many of those who opposed the Board's alternative school policy at its inception, for very valid reasons, now have recognized its value in achieving further progress. In the *Bronson* settlement the parties recognized "that the Board and Superintendent have achieved a reduction in the degree of racial isolation present in Cincinnati Public Schools through school closings, consolidations, open enrollment and through the establishment of alternative schools and programs." Moreover, they recognized "that similar educationally sound programs and efforts will achieve a further reduction in racial isolation." Indeed, part of the *Bronson* settlement was an agreement that the parties would "jointly exercise their best efforts to obtain" the ESAA funds, for the

---

**58.** We take judicial notice of the fact that enrollments in alternative programs have increased steadily since their institution in 1972. From less than 1,000 in the 1972–73 school year, the number has grown to over 16,800 in the 1985– 86 school year, which is one-third of all Cincinnati public school students. Moreover, the majority of these children ride buses to these programs. During this period, the Taueber Index of Dissimilarity has also decreased steadily.

purpose of providing additional money for such efforts to reduce racial isolation.[59]

While these considerations have not affected our legal and factual analysis above, they have aided us in determining the appropriate remedy to order in this case. This was not an adversarial proceeding in the usual sense. It was a dispute about whether money appropriated by Congress for Emergency School Aid would be spent to further the purposes of ESAA in Cincinnati or elsewhere. Having concluded that HEW's decisions to deny ESAA funding to Cincinnati in 1974 and 1976 were improper and that they must be set aside, we must now determine whether 'to order the release of the $2,896,762 now being held by HEW, and if so, what portion of it to award to Cincinnati.

■ We must first decide whether to remand this matter to the appropriate administrative agency for a determination of the relative merits of Cincinnati's and any other eligible school districts' plans as we indicated in our 1975 decision that we would do if Cincinnati prevailed on the merits of this case. *See* 396 F.Supp. at 212. We recognize that when agency action must be set aside as invalid, a reviewing court will ordinarily remand the matter to that agency to permit it to remedy the defects in the original decision. As the Second Circuit has noted, however, "[a] remand for this purpose ... necessarily assumes continuing power in the agency to deal with the subject matter. Where, because of changed circumstances, or because of the decisional grounds nullifying the initial order, the agency does not possess that authority, a remand is manifestly unwarranted." *Williams v. Washington*

*Metropolitan Area Transit Commission,* 415 F.2d 922, 939–40 (D.C.Cir.1968).

■ In this case a dozen years have elapsed since HEW's first defective eligibility decision, and a decade has passed since its second improper determination. Moreover, the Act under which these funds were awarded has been repealed, and presumably the administrative apparatus to implement it has been dismantled as well. HEW itself has not even sought a remand. Under these circumstances, therefore, remand to the agency is clearly unwarranted. We also believe that remand would be inequitable. There should be no further delays in releasing this money for its intended purpose, and consequently we order it to be disbursed.

■ Second, we must decide whether Cincinnati should be awarded all of the funds being held in escrow. HEW would have us grant only $900,000 of the 1974 funds to Cincinnati to finance programs conforming to ESAA standards that the Board undertook or planned to undertake in September 1974.[60] (Document 89 at 13.) They advocate this figure, which is less than the $1,200,000 in 1974 funds being held, because it is the amount that the Office of Education had determined merited funding. *Id.* See also Finding 56. The Board, on the other hand, would have us award all of the 1974 funds to them without hesitation.

There are three reasons why we believe that Cincinnati should be awarded all $1,200,000, notwithstanding the Office of Education's lower recommended funding level. First, during OE's review of Cincinnati's proposal, there was disagreement

---

**59.** Pursuant to this portion of the settlement, NAACP officials wrote to counsel for HEW on August 22, 1984 stating, "The release and use by Cincinnati of the funds currently held in escrow would, consistent with the statutory purpose of the Emergency School Assistance Act, assist Cincinnati in its efforts to desegregate the schools during the next seven years."

**60.** At the June 6, 1986 hearing, counsel for HEW indicated that they had had some difficulty determining the appropriate remedy in the event this Court decided for plaintiffs. This was because one of the assurances in the Board's

application was that there was no alternative funding for the proposed programs. Thus, it would be a "bit of a paradox" to award them money now to fund programs already undertaken. Counsel for HEW believed that the Department of Education is "prepared to take the position that if they undertook these activities on the assumption that if they prevailed [in this case], the money would be available then 'they ought to receive the money and we would not interpose that technicality. That would be for both years." Doc. 89 at 13.

about the propriety of the recommended cuts in the budget. (Findings 56–80.) Moreover, OE expressly refused to assist the Board in making the program adjustments required by OE's recommended funding level. (Finding 66.) We therefore do not regard their $911,000 figure as definitive.

Second, even with the assistance of counsel for both parties we have been unable to determine exactly why the 1974 escrow fund amount was set at $1,200,000 in the first place. We therefore assume that it must have been this Court's conclusion at the 1974 preliminary injunction hearing that $1,200,000 was an appropriate, not excessive amount to set aside in the event the Board prevailed.

█ Third, we find that it is equitable to order all of the money be paid to Cincinnati in order to compensate them in part for the money's decline in purchasing power resulting from the fact that the escrow account has not been drawing interest during a decade which has been characterized by periods of high inflation.[61]

With regard to the 1976 funds, counsel for HEW has expressed their difficulty in proposing a suitable remedy in the event that this Court decided to set aside their educational evaluation, as well as their ineligibility decision. (Document 89 at 14–15.)[62] Nonetheless, they indicated that distribution of the 1976 escrow funds should parallel that of the 1974 funds. *Id.*

Accordingly, we therefore order that all $2,896,762 currently being held by HEW pursuant to our earlier orders, be released immediately to the Board of Education of the Cincinnati Public Schools to be used exclusively as Congress intended that it be used—to eliminate minority group isolation while improving the quality of education for all children. The real winners in this case will therefore be the children of Cincinnati.

### ORDER

This declaratory judgment action (in effect an appeal from HEW's denial of Cincinnati Board of Education's applications in 1974 and 1976 for ESAA funds) is before the Court for final disposition pursuant to instructions of the United States Court of Appeals for The Sixth Circuit. The matter has been fully briefed and argued orally.

After careful consideration of the administrative record, as supplemented, and the relevant law, the Court declares that defendant's 1974 and 1976 decisions denying Emergency School Assistance funds to plaintiffs are arbitrary, capricious, an abuse of discretion, and contrary to law. Consequently, we must and do set aside those decisions. Defendants are hereby ordered to deliver forthwith to plaintiffs the $2,896,762.00 held in escrow pursuant to this Court's orders. This order constitutes the final judgment of the Court, terminating this case in favor of plaintiffs.

SO ORDERED.

### CONSENT DECREE

This action was instituted by plaintiffs on May 14, 1974, seeking declaratory and injunctive relief concerning the determination of the Department of Health, Education and Welfare (HEW) that the Cincinnati School District (CSD) was ineligible for funding under the provisions of the Emergency School Aid Act (ESAA), 20 U.S.C. § 1601, *et seq.* On plaintiffs' motion for preliminary injunction, defendants were ordered to create and obligate a fund of $1,200,000 from Fiscal Year 1974 ESAA appropriations to be made available to CSD to the extent that CSD was determined to be entitled to that funding and to other identified school districts to the extent that

---

**61.** We think it regrettable that this money was not placed in an interest bearing account. Nonetheless, we acknowledge the correctness of HEW's view that we may not rectify that situation at this time by assessing an award of interest against the United States. See doc. 90 at 4–17.

**62.** Specifically, counsel for HEW said, "I don't know how to find what they were educationally qualified for because our experts said they were not educationally qualified. They were program ineligible but if you release the money then you tell us what makes sense and we will try to do it." Doc. 89 at 14–15.

CSD was not entitled to the escrow money. On cross-motions for summary judgment, the district court granted judgment in favor of defendants and held applying the standard of review of the Administrative Procedure Act, 5 U.S.C. § 706, that HEW's determination of CSD's ineligibility was not arbitrary, capricious, or otherwise inconsistent with ESAA or the ESAA regulations. 396 F.Supp. 203 (S.D.Oh.1975). On appeal by CSD, the Court of Appeals reversed the order granting summary judgment, holding that there were genuine issues of material fact concerning CSD's ESAA eligibility, 532 F.2d 1070 (6th Cir. 1976) and directing that final judgment in this case not be entered until the private school desegregation case, *Bronson v. Board of Education*, No. C–1–74–205 (S.D.Oh) was finally decided. Following a second determination that CSD was ineligible for ESAA funding, plaintiffs filed a supplemental complaint on June 24, 1976, for relief from HEW's determination and again sought declaratory and injunctive relief. Defendants were ordered that day to establish an additional escrow account in the amount of $1,884,401, which was subsequently reduced to $1,696,762 upon agreement of the parties on May 6, 1977. Defendants' appeal on the ground that the district court erred in not considering separately the additional ground for ineligibility, i.e. that the 1976 applications were lacking in programmatic quality, which was not involved in the 1974 adjudication, was unsuccessful. Thereafter, this case was held in abeyance until 1984, when the *Bronson* litigation was resolved by consent decree which was approved by this Court after a fairness hearing. This litigation then recommenced with filing of the record of the administrative proceedings, briefing of the merits of the parties respective positions, oral argument, and supplemental briefing, after which the Court on July 8, 1986, granted judgment for plaintiffs on all issues and ordered that the escrowed funds be immediately disbursed to plaintiffs.

Thereafter, defendants filed a motion under Rule 59 to alter or amend judgment on multiple grounds and for a stay in the event the Rule 59 motion was decided adversely to defendants. Plaintiffs opposed the Rule 59 motion. Plaintiffs subsequently filed a motion under Rule 60 for amendment of the judgment to provide for postjudgment interest which defendants have opposed. Plaintiffs also filed a claim for attorneys fees under ESAA which defendants have opposed. The respective positions of the parties regarding these claims are fully briefed. In addition, plaintiffs have stated an intent to file an amended claim for attorneys' fees under the Equal Access to Justice Act, which defendants represent they will contest as inapplicable to this action.

The parties recognize that the numerous points of contention embodied in the strongly divergent positions summarized above preclude a final resolution of this case under the existing judgment without additional, and likely prolonged, proceedings. All parties, however, acknowledge the wisdom of the District Court's observation that this twelve year old case should be terminated now. To that end, the parties have negotiated the agreement embodied in this decree to fairly provide for distribution of the escrowed ESAA moneys consistent with that statute's stated purposes and provide a mutually satisfactory basis for termination of this litigation. In agreeing to this settlement, federal defendants do not waive their contention that its findings as to ineligibility of plaintiffs in 1974 and 1976 for ESAA funding, on the grounds specified at length in the record of these proceedings, are correct. In agreeing to this settlement, plaintiffs do not waive their contention that the findings of ESAA ineligibility were arbitrary, capricious, and otherwise not in accordance with law, on the grounds specified at length in the record of these proceedings. The parties acknowledge that, at different times during the pendency of this case, each side has had judgment granted in its favor and against it and that entry of judgment has engendered further contested litigation. Through entry of this consent decree the parties have resolved to terminate this cycle of litigation. To this end, the parties have compromised by waiving final adjudi-

cation on the merits of the disputed issues herein and request and agree to entry of this Order in final resolution of this case.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that the opinion herein of July 2, 1986 and judgment of July 8, 1986, be superceded by this final order and judgment, to which the parties consent.

## I.

It is ORDERED that the Department of Education, having received the independent audit of expenditures for 1985–1986 pursuant to *Bronson* and having ascertained that plaintiffs have conducted activities which qualify for ESAA funding up to the amount of the ESAA funds held in escrow pursuant to orders in this case, shall within thirty (30) days of entry of this order take all necessary steps to authorize release of the escrowed funds for reimbursement of plaintiffs' ESAA eligible expenditures in the amount of $2,896,762.

## II.

It is further ordered that in resolution of attorneys' fees claims, $200,000 of the escrowed money awarded to plaintiffs under Part I may be denominated attorneys' fees.